UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DONNY PHILLIPS,

      Plaintiff,

v.

RICKY DIXON, *et al.*,

      Defendants.

Case No. 3:22-cv-997-BJD-LLL

## MOTION FOR PRELIMINARY INJUNCTION

The Florida Department of Corrections (FDC)[1] is refusing to comply with tis internal policies and legal obligations to provide Plaintiff Donny Phillips with a required transfer to a specialized wound-care facility, appropriate medical care, and necessary mobility devices. These failures have caused his recurring cellulitis to flare and spread. Mr. Phillips's experts have concluded that the unabated spread of his cellulitis will be a matter of life and limb—literally, as he may lose his lower right leg from the open and untreated infection, as shown by these photographs of that area taken on October 22, 2022 (left), March 1, 2023 (center), and August 2, 2023 (right):

  

---

[1] In this motion, "FDC" and "Dixon" will be used interchangeably to refer to the Florida Department of Corrections.

Because FDC is refusing to comply with its policies and obligations under the Eighth Amendment, Mr. Phillips moves for preliminary injunctive relief and an order declaring that FDC's actions violate the Eighth Amendment to the Constitution.

### Factual Background

#### *Cellulitis Risks in the Prison Setting*

1.      Cellulitis is a bacterial skin and tissue infection. *See* Centers for Disease Control and Prevention, *Group A Streptococcal (GAS) Disease*, https://www.cdc.gov/groupastrep/diseases-public/Cellulitis.html.

2.      Recurrent episodes of cellulitis may damage the lymphatic drainage system and cause chronic swelling of the affected area. *See* Mayo Clinic, *Cellulitis*, https://www.mayoclinic.org/diseases-conditions/cellulitis/symptoms-causes/syc-20370762.

3.      According to the United States Bureau of Prisons, treatment for "significant cellulitis" and similar conditions in the custodial setting should include treatment with intravenous antibiotics for 4-6 weeks along with other follow-up treatments if indicated. *See* Federal Bureau of Prisons, *Management of Methicillin-Resistant* Staphylococcus aureus *(MRSA) Infections*, Clinical Practice Guidelines (Apr. 2012), at 6, https://www.bop.gov/resources/pdfs/mrsa.pdf.

4.      Without prompt treatment, cellulitis can cause infection to reach the bloodstream resulting in bacteremia and endocarditis, and movement of the infection from the skin to the bone can cause osteomyelitis, or bone infection. Brandon B.

Brown, Kristen L. Hood Watson, *Cellulitis* (Aug. 8, 2022),

https://www.ncbi.nlm.nih.gov/books/NBK549770/. "Repeated bouts of cellulitis,

if not curtailed, can lead to blood and bone infection, sepsis, amputation, and even

death." July 14, 2023 Report of Jason L. Chertoff, M.D., MPH, at 3, attached as

**Exhibit 1**.

5.     A peer reviewed study of sepsis based on results from Shands Hospital

in Gainesville, Florida, which is located just south of the so-called "Prison Triangle"

or "Iron Triangle," concludes that nearly three times as many prisoners admitted to

the hospital with sepsis die over non-prisoners.[2] Sepsis was one of the 10 leading

medical causes of death among state prisoners from 2001 to 2004. *See* U.S.

Department of Justice, *Medical Causes of Death in State Prisons, 2001-2004*, at Appendix

1,  https://bjs.ojp.gov/content/pub/pdf/mcdsp04.pdf; *see also* Chertoff, J., *Prisoners

in the United States Likely to Have Higher Odds of Death From Sepsis*, CHEST Journal,

Vol. 152, Issue 3, at 682-83 (2017), https://doi.org/10.1016/j.chest.2017.06.034

("clear evidence of an association between sepsis mortality and incarceration").

6.     According to a report by the U.S. Department of Justice's Bureau of

Justice Statistics, average annual mortality in Florida prisons leads the nation despite

not having the highest prisoner population. *See* U.S. Department of Justice, *Mortality

in State and Federal Prisons, 2001-2019 – Statistical Tables*, at Table 17,

---

[2] Chertoff, J., Stevenson, P., & Alnuaimat, H, *Sepsis Mortality in the US Correctional System: An Underappreciated Disparity*, Journal of Correctional Health Care, 24(4), 337-41 (2018), attached as **Exhibit 2**.

https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf.

### *Mr. Phillips Develops Cellulitis in FDC Custody*

7.     Plaintiff Donny Phillips suffers from bladder and bowel incontinence due to a spinal injury which prevents him from feeling when his bladder or bowels are full, and he often must quickly access a toilet or rely on adult diapers. (Doc. 25 ¶¶ 20–21).

8.     Mr. Phillips also suffers from incomplete paraplegia (paraparesis), venous insufficiency, a history of blood clots, obesity, and a history of repeated cellulitis—a soft tissue infection that can lead to sepsis, amputation, and death. (*Id.*); *see also* Ex. 1.

9.     For nearly seven years, Mr. Phillips has been subjected to denial of the hygiene supplies he requires to cope with his bladder and bowel incontinence because he is considered a "writ-writer"[3] by prison staff. *See, e.g.*, Mr. Phillips's Verified Answer to FDC's Interrogatory No. 4, attached as **Exhibit 3**.

10.    Because of the lack of necessary hygiene supplies, Mr. Phillips must compensate by using the toilet regularly, yet often he has accidents. *See id.* At one time, Mr. Phillips possessed bathroom and shower passes, but for the past nearly three years, he has been denied passes for open bathroom access, as well as for showers to clean himself after accidents. *See id.* at Response to Interrogatory Nos. 3 & 4.

---

[3] "Writ-writer" is a prison term for a prisoner who files frequent grievances or lawsuits. *See* Ex. 2 at Response to Interrogatory No. 4(a).

11.     The medical and security staff at Suwannee Correctional Institution, where he is confined, intermittently withhold, or reduce hygiene supplies (adult diapers, barrier creams, antiseptic soaps, sanitary wipes) and fail to issue or honor bathroom and shower passes to allow him to clean himself. *Id.* These failures have created dangerous conditions for Mr. Phillips. Mr. Phillips' bathroom and shower passes were rescinded or not renewed when he came to his current institution. (Id.).

12.     For example, at times Mr. Phillips has been denied diapers, provided too few diapers for his needs, or provided diapers too big or too small to fit him, resulting in a combination of feces and urine from running down his legs. *Id.* at Response to Interrogatory No. 3. The failure to provide appropriate hygiene supplies has caused repeated and prolonged exposure to fecal bacteria, which, in 2018 brought on Mr. Phillips's documented and diagnosed cellulitis. With cellulitis, repeated exposure to urine and fecal bacteria can create conditions that can quickly lead to sepsis, gangrene, amputation, septic shock, and death. Ex. 1 at 5–6.

13.      Mr. Phillips also has a history of poor circulation and is diagnosed with arterial insufficiency, *see id.* at 4, a separate condition that can also contribute to loss of a limb or death.

### *Mr. Phillips Seeks Court Intervention to Provide Appropriate Medical Care*

14.     In 2018, Mr. Phillips sued the FDC, private medical contractors, and several individuals pertaining to unlawful conduct at Franklin Correctional Institution and Northwest Florida Reception Center (NWFRC). *Phillips v. Inch*, No. 4:18-cv-00139-MW-CAS (N.D. Fla.) (the "FLND Action").

15.     In the FLND Action, Mr. Phillips disclosed a report by his correctional medical expert, Dr. Donald Kern, M.D., who concluded to a reasonable degree of medical certainty that Mr. Phillips's "inability to maintain good skin hygiene has resulted in multiple bouts of infection (cellulitis) both bacterial and fungal." *See* February 4, 2019 Report of Donald C. Kern, M.D., MPH, CCHP, at 3–4, attached as **Exhibit 4**. In that disclosed report Dr. Kern concluded that

> Each bout of cellulitis may cause further damage to an already impaired circulatory system, which in turn may lead to further edema and further difficulty maintaining skin and limb viability, ultimately with the potential of requiring amputation. In the worst case, infection from the skin (cellulitis) may unpredictably spread to the blood stream (sepsis) and potentially result in death.

16.     There, Chief Judge Mark Walker entered a preliminary injunction requiring FDC to provide Mr. Phillips with the following hygiene supplies to control and abate his cellulitis symptoms:

a.     Five or more diapers a day (as needed);
b.     Barrier creams;
c.     Antiseptic soap;
d.     Medical wipes;
e.     Bathroom passes; and
f.     Shower passes.

*See* FLND Action, Doc. 198.

17.     The Court did not provide Mr. Phillips with his other requested relief, which included, among other things, placement in a hospital environment until his cellulitis healed and movement to an "over-50" lower security prison with resources

for elderly, disabled, and chronically ill prisoners.[4]

18.     Mr. Phillips sought to renew his time-limited preliminary injunction under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(2), which the defendants in the FLND Action opposed. The court denied Mr. Phillips's motion to renew the injunction in part because FDC and the other defendants stated, "there is no need for a continued injunction because they are providing the materials and services the motion sought" and that "they will continue with the supplies with or without an injunction." FLND Action, Doc. 312 at 2, 5–6.  Even so, FDC continued to intermittently deny adequate quantities or types of diapers and other hygiene supplies.

19.     On October 15, 2020, FDC transferred Mr. Phillips to Suwannee C.I., which like NWFRC is a high-security camp. Upon arrival his medications were confiscated and staff there stopped providing sufficient hygiene supplies. *See* Ex. 3 at Response to Interrogatory No. 4(g).

### *At Suwannee C.I., Mr. Phillips is Denied Adequate Medical Care*

20.     Since he was transferred to Suwannee C.I., Mr. Phillips has been denied medical treatment and he asserts that his Braden Scale scores—which would reflect

---

[4] Plaintiff is 63 years old, not incarcerated for violent offenses, and has no record of violence as a prisoner. Yet he continues to be kept high-security prisons with violent offenders and substantial gang activity in retaliation for his grievances and litigation efforts. *See* Ex. 2 at Response to Interrogatory No. 4(j). In that setting, older, chronically ill and disabled prisoners who receive canteen money on a regular basis are vulnerable to extortion and violence. *See id.* In addition, Mr. Phillips experiences times where he is forced to remain in foul-smelling diapers for sustained periods, which has made him a target of ostracism and sometimes violence. *See id.*

the health of his cellulitis-afflicted leg—have been improperly tabulated to present on paper that Mr. Phillips's cellulitis is under control, when the photographic evidence paints the picture of someone who is in desperate need of care before he loses his leg or becomes septic. *See* Ex. 3 at Response to Interrogatory No. 4(f). The photographs show both the continued spread of the cellulitis on Mr. Phillips's right leg—he also states under oath that it is spreading to his left leg, *see id*. at Response to Interrogatory No. 3—and the deep, concerning wounds that are leaking.

21.     In the operative Complaint, his interrogatory responses, and his responses to FDC's requests for admissions, Mr. Phillips has also detailed failures to provide adequate supplies, which have diminished over time in size and quantity. For example, Judge Walker had ordered FDC to provide Mr. Phillips with 5 diapers a day. Since his transfer to Suwannee C.I., Dr. Alexis Figueroa reduced his amount to 3 per day, then 20 per week, and then to 15-18 per week. *See id.* at Response to Interrogatory No. 4(g). At Suwannee C.I., Mr. Phillips's antiseptic wipes have been reduced from 80- to 50-count packs, *see id.*, which are specifically not indicated for Mr. Phillips's open wounds. Further, Mr. Phillips has been effectively denied medical passes to enable him to use the bathroom and shower as needed, keeping him in soiled diapers. *See id.* at Response to Interrogatory No. 4(b). His mobility boots—which were prescribed to him to help with circulation—were stolen and FDC refuses to replace them. *See id.* at Responses to Interrogatories Nos. 1 & 2. Despite Mr. Phillips's increasingly concerning and serious medical condition, FDC has reduced his medical and hygiene supplies, exacerbating Mr. Phillips's condition.

### *Opinion and Recommendations of Jason Chertoff, M.D., MPH*

22.     Dr. Chertoff, a board-certified diplomat of Internal Medicine,

Pulmonary and Critical Care Medicine, and Neurocritical Care Medicine, who has

often worked in medical and surgical intensive care units, who wrote a report for

Plaintiff's prior lawsuit, and who has authored several studies on sepsis and mortality

in the U.S. prison system, *see infra*, rendered the opinion in this lawsuit that Mr.

Phillips's condition has failed to improve since the FLND Action. He opined to a

reasonable degree of medical certainty that Mr. Phillips "has an exceptionally high

risk of developing recurrences of his cellulitis or another soft tissue infection." Ex. 1

at 3.

23.     Dr. Chertoff supports the earlier opinion of Dr. Kern from the FLND

Action that Mr. Phillips has most of the classic vulnerabilities for recurrences of

cellulitis, along with the factor of being a prisoner. He cites that 47% of patients

treated for cellulitis experienced another episode of cellulitis within three years. *Id.* at

4. He also concludes that "elevation of the affected limb, support stockings, and good

skin hygiene can reduce the risk of recurrence." *Id.* An important consideration in

reducing risk is also keeping the skin well hydrated with emollients.[5] Because

infections can move from flesh to blood to bone, Dr. Chertoff recommends

exploratory diagnostic imaging, such as CT scan or MRI, for Mr. Phillips to

determine whether there is deep tissue or bone infection. *Id.* He notes that no such

---

[5] Mr. Phillips's supplies of barrier creams have been reduced from 8 oz. to 1 oz. since arriving at Suwannee C.I. *See* Ex. 3 at Response to Interrogatory No. 4(h).

exploration appears to have ever been done. *Id.*

24.     In his disclosed report, Dr. Chertoff also stresses that "consistent sustained care" is needed to prevent recurrences of cellulitis and ward off the potential for sepsis. *Id.* Dr. Chertoff notes that FDC has never accessed its specialized wound care program, even though one of the indicators for that program is that the condition has not resolved within two months.

25.     According to FDC's Health Services Bulletin No. 15.06.06, the Infection Control Program Manual is a required FDC manual for the provision of health services in its institutions. *See* Health Services Bulletin No. 15.06.05, attached as **Exhibit 5**. The Infection Control Program Manual requires institutional health professionals to be familiar with wound care protocols and to evaluate wound healing progress. *See* Infection Control Program Manual Chapter XXII, at 2, attached as **Exhibit 6**. To render these evaluations, Braden Scale testing must be done, and wound evaluation and care must be provided and documented. *See id.* at 2 –3. In the event a wound has failed to health within two months, and for wounds that "repeatedly break down," the FDC Regional Medical Director must approve transfer to a wound care specialty facility, such as Central Florida Reception Center South Unit and Zephyrhills, among others. *Id.* at 6.[6]

---

[6] Of the facilities listed, some are inappropriate as women's facilities, and others are concerning given Mr. Phillips's prior lack of medical supplies and accommodations there, like Northwest Florida Reception Center where he languished for two years with insufficient medical care and wound treatment. Although Mr. Phillips understands that if the Court were inclined to order a transfer to a specialized wound-care facility his preferences may not be an appropriate consideration; nevertheless, given the animosity he

26.     Here, Mr. Phillips has had recurrences of cellulitis for five years and the photographic record, *infra*, shows serious and worsening symptoms. A comparison of the photographs appended to Dr. Kern's report in the previous FLND Action, *see* Ex 4 at 4–6, to the ones taken this month, show that Mr. Phillips's wounds are significantly spreading and worsening. Given these conditions, Dr. Chertoff recommends as follows:

> It is my medical opinion that Mr. Phillips remains at an extraordinarily high risk for cellulitis, and other soft tissue infections. Mr. Phillips has chronic leg edema so severe that he has required a daily diuretic medication, has chronic venous insufficiency, lymphedema, dermatitis, frequent fungal infections, a history of a previous cellulitis, and is morbidly obese (BMI 37), all repeatedly proven risk factors for recurrent cellulitis. Since only a few interventions, such as attentive skin care and hygiene, leg elevation, weight loss, compression stockings, and prompt treatment of fungal infections, and regular wound care oftentimes by a dedicated wound care team have been shown to prevent recurrences, it is imperative that Mr. Phillips have these resources available. It is certainly reasonable to attribute Mr. Phillip's initial cellulitis to limited opportunities for personal hygiene and poor sanitary conditions, and I am confident that enhancements in these conditions will improve his condition. Undoubtedly, providing Mr. Phillips with necessary sanitation and personal hygiene resources, will provide him with the best chance for a complete cure and prevention of recurrence. It also would be prudent to proceed with a CT scan or MRI to rule out an underlying deep tissue infection, as well as noninvasive vascular studies (i.e., ABI) to assess for adequate perfusion in the extremity. It should be kept in mind that repeated bouts of cellulitis, if not curtailed, can lead to blood and bone infection, sepsis, amputation, and even death.

Ex. 1 at 5–6.

---

received at NWFRC and Reception and Medical Center, he would ask for some discretion in where he is transferred if the Court orders such relief.

*Opinion and Recommendations of Homer Venters, M.D., MPH*

27.     Dr. Venters, whose report was also disclosed here, agrees with Dr. Chertoff point by point. Dr. Venters is a leading expert in medicine and epidemiology in a corrections setting, a Senior Health and Justice Fellow of the Community Oriented Correctional Health Services (COCHS), and a recognized national leader in health and human rights. Dr. Venters served as the Director of Programs for Physicians for Human Rights and the Chief Medical Officer for the New York City jail system. In addition to being the author of *Life and Death in Rikers Island*, Dr. Venters has had over 50 peer reviewed scientific articles on the topics of health and justice involvement, work that has been cited by the U.S. Supreme Court and has led to testimony before Congress.

28.     Dr. Venters agrees that Mr. Phillips has an extraordinary vulnerability to dangerous tissue infections, which began in July 2018 and have not ceased. July 28, 2023 Report of Homer Venters, M.D., MPH, attached as **Exhibit 7**. He also endorses the report of Dr. Kern in the FLND Action. Dr. Venters expresses concern that Mr. Phillips has continued to show the symptoms of cellulitis. He expresses concern that at one point in 2020 Dr. Figueroa at Suwannee C.I. stated that "I don't recommend wipes or pull ups bc patient is continent and has no rash." *Id.* at 10. The photographic evidence shows that Mr. Phillips's cellulitis has and continues to flare up. Dr. Venters also expresses surprise in his report at the manipulation of the Braden Scale Inventory, which FDC is required to undertake under its wound-care protocols, to make it appear that Mr. Phillips did not require attention of clinicians to

monitor his skin condition. Ex. 7 at 12. He was also concerned that the ADA authorities at Suwannee C.I. denied Mr. Phillips's therapeutic "shoes and boots [because they] are not ADA." *Id*. at 13.[7] Mr. Phillips was prescribed those boots by FDC to support his weak ankles to help him walk holding on to his wheelchair. *See* Ex. 3 at Response to Interrogatory No. 1.

29.    Dr. Venters states in his report that based on his own experience as the chief medical officer of a large correctional health service, when a patient's health care needs can no longer be satisfied by the existing facilities, "a transfer to a higher level of care is required." Ex. 7 at 14. He notes that when a facility cannot respond to the patient's health care needs, "friction quickly develops" involving retaliation by both health and security staffs which can endanger the prisoner's health further. *Id*. at 15. Dr. Venters recommendations can be summarized as follows:

    a.  Transfer Mr. Phillips to a setting with the ability to cope with patients with complex medical and mobility needs and geriatric care.

    b.  Ensure monthly skin checks;

    c.  Provide at least three pull-up diapers per week, at least 80 medical wipes per week, antiseptic soap, and barrier creams;

    d.  Provide unimpeded access to toilet paper and use of bathroom and showers and medical passes necessary this access;

    e.  Ensure privacy partitions for Mr. Phillips when he showers.

*Id.* at 17–18.

---

[7] More recently, Mr. Phillips has been informed that FDC no longer considers him an ADA inmate—a perplexing conclusion given that he remains incontinent and wheelchair bound.

30.     Based on the evidence, Mr. Phillips may seek additional relief in this interim stage or for a later permanent injunction.

### Memorandum of Law

To prevail on a motion for a preliminary injunction, a plaintiff has the burden of proving four essential elements: (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat of irreparable injury if an injunction does not issue; (3) the threatened injury to plaintiff outweighs any harm that might result to the defendants; and (4) that the injunction, if issued, would not be adverse to the public interest. *Palmer v. Braun,* 287 F.3d 1325, 1329 (11th Cir. 2002). All four factors weigh in Mr. Phillips's favor.

### A. Mr. Phillips Has a Substantial Likelihood of Success on the Merits of his Eighth Amendment Claims.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "The 'cruel and unusual punishments' standard applies to the conditions of a prisoner's confinement." *Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004). An Eighth Amendment challenge to the conditions of confinement has two components: one objective and the other subjective. *See Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

First, to satisfy the "objective component," the prisoner must show "an objectively intolerable risk of harm." *Id.* He must show that the challenged conditions were "extreme" and presented an "'unreasonable risk of serious damage

14

to his future health' or safety." *Chandler*, 379 F.3d at 1289 (quoting *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). Second, to satisfy the "subjective component," the prisoner must show that the prison official acted with deliberate indifference. *Chandler*, 379 F.3d at 1289. A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). A prison "official may escape liability for known risks 'if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Chandler*, 379 F.3d at 1290 (quoting *Farmer*, 511 U.S. at 844, 114 S.Ct. 1970). Both prongs are met here.

As to the objective component, Mr. Phillips suffers from an objective risk of harm—specifically a "serious medical need." *Gilmore v. Hodges*, 738 F.3d 266, 274 (11th Cir. 2013) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.") (citations and quotations omitted). He has been diagnosed with incontinence, paraparesis, venous insufficiency and cellulitis. The photographs embedded at the top of this motion show that since the institution of this lawsuit Mr. Phillips's cellulitis has continued to spread and fester unabated. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (condition can also qualify as serious medical need if "left unattended, 'pos[es] a substantial risk of serious harm'") (quoting *Farmer*, 511 U.S. at 834). Mr. Phillips's expert witnesses—correctional physicians and specialists—have also concluded that

the failure to mitigate Mr. Phillips's worsening cellulitis will cause even more serious risk of harm, including the possibility of sepsis, bone infection, amputation, and death. *Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008) (medical need is serious if "a delay in treating the need worsens it"); *Sims v. Figueroa*, No. 21-10647, 2022 WL 188485, at *5 (11th Cir. Jan. 21, 2022), *cert. denied*, 213 L. Ed. 2d 1102, 142 S. Ct. 2888 (2022) (to be satisfy Eighth Amendment inquiry delay must seriously exacerbate the medical problem ... [and be] medically unjustified," quoting *Taylor*, 221 F.3d at 1260) (alterations in original). Accordingly, Mr. Phillips has a likelihood of prevailing on the first prong. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1298 (11th Cir. 2005) ("A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than *certain* success.") (emphasis in original).

Mr. Phillips must then show that FDC and the individual defendants "subjectively knew of the substantial risk of serious harm and that [they] knowingly or recklessly disregarded that risk." *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (alteration in original) (quoting *Halte v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995)). Whether prison officials possessed the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. Here, the risk was obvious, particularly given the history between the parties, the prior federal injunction, and the knowledge

16

that the concerns had not been resolved since the expiration of that injunction. *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) ("[K]nowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference."); *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) ("A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference."). There is no medical justification for the failure to provide Mr. Phillips with appropriate treatment. FDC's policies mandate transfer to an appropriate wound-care facility for wounds that have not healed within two months or those that "repeatedly break down." *See* Exs. 6 & 7. The failure to comply with those policies is evidence of deliberate indifference. *Stewart v. Johnson*, No. 5:18-CV-37, 2021 WL 3081882, at *3 (S.D. Ga. July 21, 2021) ("evidence of a policy violation may be evidence of deliberate indifference"); *Hope v. Pelzer*, 536 U.S. 730, 743-44 (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct."). Applying these legal standards, the court in the FLND Action enjoined FDC from providing Mr. Phillips with insufficient hygiene supplies. Despite agreeing and telling the court in that case that it would honor the terms of the time-expired injunction, it has gone back on its word, diminishing Mr. Phillips's supplies, which in turn has caused his cellulitis to continue to flare and spread. Although the Court in the FLND Action did not grant Mr. Phillips's request to transfer him, the conditions here have continued and worsened to the point where FDC is violating its own policy for no medical or penological reason. The only

17

reasonable explanation is punishment. Because FDC has no justification for departing from the standard of care or its policies, its failures constitute deliberate indifference.

### B. Mr. Phillips Will Continue to Suffer Irreparable Injury in the Absence of a Preliminary Injunction.

In the context of Eighth Amendment claims challenging conditions of confinement, "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002) (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1998)). Moreover, "the irreparable-injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent." *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (affirming permanent injunction against FDC Secretary enjoining staff from using chemical agents on certain prisoners). "'[I]njunctive relief is appropriate to prevent a substantial risk of serious injury from ripening into actual harm.'" *Id.* at 1318 (quoting *Farmer*, 511 U.S. at 845).

In the FLND Action, Mr. Phillips demonstrated he would suffer irreparable injury under conditions that exposed him to repeated and prolonged exposure to fecal bacteria with compromised integrity of his skin. "Absent a preliminary injunction as to medical and hygienic supplies, irreparable injury will follow." FLND Action, Doc. 198 at 10. Despite the history of failing to provide adequate treatment to Mr. Phillips, FDC continues to allow his cellulitis to fester and spread

through its failure to provide adequate sanitation supplies and medications, indicated therapeutic medical boots, and appropriate wound care. "If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury," for example "by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *18 (11th Cir. Apr. 15, 2022) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). The Court should find that Mr. Phillips will suffer an irreparable injury absent an injunction.

### C. The Balance of Hardships Favors a Preliminary Injunction.

When the nonmovant is the government, "the third and fourth requirements— 'damage to the opposing party' and 'public interest'—can be consolidated." *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020).

Although when weighing the balance of the hardships courts have found in some cases that prisoners do not have a constitutional right against being transferred to another institution, have no right to incarceration in a prison of their choice, and have no right to any prisoner status classification, *see, e.g.*, *Smith v. Crews*, 738 F. App'x 981, 984 (11th Cir. 2018), Mr. Phillips is not asking for special treatment here. Instead, he is asking FDC to provide constitutionally adequate treatment by providing enough diapers that properly fit him, sufficient and properly indicated soaps and creams, ensure that his prescribed therapeutic boots are resupplied, and follow guidelines to transfer him to a proper wound-care facility until such time that his wounds are no longer open or "repeatedly breaking down."

In the FLND Action, a sister court found that the balance of the equities favored Mr. Phillips based on his lack of supplies to prevent the spread of his cellulitis and that "for Plaintiff, it could mean the difference between life and death." FLND Action, Doc. 198 at 10. The threatened injury to Mr. Phillips outweighs whatever damages FDC would face by sending Mr. Phillips to one of its wound-care facilities or providing him with sufficient supplies. Although courts generally hesitate to interfere with prison administration, *Mendoza v. Inch*, No. 4:20-CV-00214-MW-MAF, 2021 WL 4046716, at *2–3 (N.D. Fla. Aug. 12, 2021), report and recommendation adopted, No. 4:20CV214-MW/MAF, 2021 WL 4037422 (N.D. Fla. Sept. 3, 2021) (collecting cases), when FDC decides to ignore its policies and constitutional obligations to an inmate like Mr. Phillips, he has nowhere else to turn other than this Court to ensure that he is not left to succumb to the more extreme maladies his expert witnesses believe are probable given the lack of proper care.

And the costs associated with the injunctive relief Mr. Phillips seeks (additional supplies) are minimal. *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1304 (N.D. Fla. 2017) ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants," quoting *Laube v. Haley*, 234 F.Supp.2d 1227, 1252 (M.D. Ala. 2002)). As the Eleventh Circuit panel in *Melendez* held, although prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," that does not mean that the Constitution can be ignored—

20

"the public interest is served when constitutional rights are protected." *Melendez*, 2022 WL 1124753, at *17 (affirming injunction against FDC). In *Melendez*, FDC argued that the injunction requiring Mr. Melendez to be returned to general population status from close management violated separation of powers by "sidestepping their expertise and judgment" in essence requiring their officials to "seek[] a permission slip from the district court" if they wanted to change Mr. Melendez's status. *Id.* at 21. The panel found that argument without merit because "[f]ederal courts have the authority to eliminate and remedy unconstitutional conditions, e.g., those constituting cruel and unusual punishment under the Eighth Amendment." *Id.* (collecting cases). Federal courts "must not shrink from [our] obligation to enforce the constitutional rights of all persons, including prisoners." *Id.* (internal quotations and citation omitted). So too here should the Court require FDC to provide Mr. Phillips with constitutionally required care, including a transfer under its policies to one of its identified wound-care facilities to treat his open wounds.

### D. Mr. Phillips Should Not Be Required to Post a Bond.

Mr. Phillips requests that this Court waive the bond requirement under Fed. R. Civ. P. 65(c). A bond is not required when the party seeking the injunction has high probability of success, an injunction is sought against the government that would not incur significant cost, and requiring payment would injure the constitutional rights of the plaintiff or the public. *Univ. Books & Videos, Inc. v. Metropolitan Dade Cnty.*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999); *BellSouth*

*Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (bond is discretionary). All three requirements are met here. If granted, the preliminary injunction would constitute 90 days of increased diaper and hygiene supplies and treatment at a facility owned by FDC. The danger of an improperly granted injunction to FDC is "so minimal as to be virtually nonexistent." *Marsh v. Moore*, 325 F. Supp. 392, 394 (D. Mass. 1971) (no bond for injunction regarding noncensored prison mail). Further, given that the injunction is temporary under the PLRA unless later findings are rendered or a final order is entered, the risk of harm should further dissipate. Finally, the Court should consider that Mr. Phillips is a state prisoner with limited means to satisfy a bond. *Booher v. Marion Cnty.*, No. 507CV00282WTHGRJ, 2007 WL 9684182, at *4 (M.D. Fla. Sept. 21, 2007) (no bond in public interest case involving a homeless and indigent plaintiff against the government).

### E.  The Proposed Injunction Satisfies the PLRA.

For cases "with respect to prison conditions," the PLRA states that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). A court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.* The PLRA provides that "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry" unless the district court does two things. 18 U.S.C.

§ 3626(a)(2). The first thing the district court must do to keep a preliminary injunction alive past the 90-day deadline is "make[ ] the findings required under subsection (a)(1) for the entry of prospective relief." *Id.* The second is to "make[ ] the order final before the expiration of the 90-day period." *Id.* The PLRA "require[s] particularized findings that each requirement imposed by the preliminary injunction satisfies each of the need-narrowness-intrusiveness criteria." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1278 (11th Cir. 2020) (alteration in original/citation omitted). That said, the PLRA does not create a higher burden. *See Gilmore v. People of the State of California*, 220 F.3d 987, 1006 (9th Cir. 2000) (calling the needs-narrowness-intrusiveness test "a nearly identical standard" to the pre-PLRA standard).

The proposed injunction complies with the PLRA. The relief is narrowly drawn, as the remedy's scope is proportional to the violation—the failure to treat Mr. Phillips's wounds to be corrected with increased supplies, restoration of his therapeutic boots, and transfer per FDC policy to one of its wound-care facilities. Nothing in this injunction requires a broad change to FDC's policies or the implementation or management of its medical care. Similarly, the relief extends no further than necessary to correct the harm—to treat Mr. Phillips's open wounds and ensure that he has the supplies necessary to mitigate the risk of further spread of the cellulitis. *Thomas v. Bryant*, 614 F.3d 1288, 1326 (11th Cir. 2010) (concluding an injunction was narrowly tailored where it governed the department's treatment of only one inmate "only target[ed] the narrow constitutional violation identified by the

23

district court"—i.e., "the district court's injunction [did] not prohibit all nonspontaneous use of chemical agents on [the inmate] but merely require[d] that the [department's] trained mental health staff evaluate his psychological state prior to authorizing such force").

As for the question of "public safety," the PLRA does not require "the court to certify that its order has no possible adverse impact on the public." *Brown v. Plata*, 563 U.S. 493, 534, 131 S. Ct. 1910, 1941, 179 L. Ed. 2d 969 (2011). Instead, any order requiring the state to adjust its incarceration policy will present a "risk that the order will have some adverse impact on public safety in some sectors." *Id.* Again, the proposed injunctive relief does not change any policy or procedure for FDC or its facilities. Instead, the relief would compel FDC to comply with its constitutional requirements and policies on wound care. The result of an injunction would be for FDC to operate through its preexisting policies and procedures without requiring any new scope of training or administrative changes. There is no harm to public safety that would occur from the Court requiring FDC to provide constitutionally adequate medical care to Mr. Phillips.

## <u>Conclusion</u>

WHEREFORE, Plaintiff Donny Phillips respectfully requests the following relief:

A.     A preliminary injunction ordering Defendant Ricky D. Dixon, in his capacity as Secretary of the Florida Department of Corrections, to: (1) immediately provide Mr. Phillips with no fewer than 5 "pull up" adult diapers per

day; (2) immediately provide Mr. Phillips with no fewer than 80 medical wipes per week; (3) immediately provide Mr. Phillips with at least 8 ounces of barrier creams (skin protectants) per week; (4) immediately provide Mr. Phillips with antiseptic soap (Dial and Hibiclens); (5) immediately provide Mr. Phillips with a medical pass for bathroom use; (6) immediately provide Mr. Phillips with a medical pass for shower use; (7) immediately resupply Mr. Phillips with high-topped therapeutic boots; and (8) immediately transfer Mr. Phillips to one of FDC's designated specialized wound-care facilities for cellulitis treatment.

        B.  An order waiving the posting of a bond for security.

        C.  Such other relief that may be just and equitable.

Dated: August 18, 2023.

                        Respectfully submitted,

                        */s/ James V. Cook*
                        James V. Cook (FBN 0966843)
                        LAW OFFICE OF JAMES COOK
                        314 W. Jefferson Street
                        Tallahassee, Florida 32301
                        Tel. (850) 222-8080
                        cookjv@gmail.com

                            -and-

                        */s/ James M. Slater*
                        James M. Slater (FBN 111779)
                        SLATER LEGAL PLLC
                        113 S. Monroe Street
                        Tallahassee, Florida 32301
                        Tel: (305) 523-9023
                        james@slater.legal

                        *Attorneys for Plaintiff*