## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**DONNY PHILLIPS,**

     **Plaintiff,**

**v.**                                                          **Case No. 3:22-cv-997-BJD-LLL**

**RICKY DIXON, in his Official Capacity as
Secretary of the Florida Department of
Corrections, CENTURION OF FLORIDA,
LLC, MHM HEALTH PROFESSIONALS,
LLC, ALEXIS FIGUEROA, M.D.,
ELIZABETH HOLMES, BRITTNEY
CANNON, CONNIE LYNN ADAMS, SGT.
SAVONIA RICHARDSON-GRAHAM, SGT.
DEBRA ALDRIDGE, and OFCR TERESSA
FILLMORE HAWTHORNE**

     **Defendants,**

_____/

## DEFENDANT DIXON'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DOCUMENT PRODUCTION AND BETTER ANSWERS

Defendant, Ricky Dixon, by and through undersigned counsel, hereby files his Response to Plaintiff's Motion to Produce Documents and Better Answers [Doc. 94]. Plaintiff has alleged 11 general defects and 24 insufficient individual discovery responses to his Requests to Produce and Interrogatories contained within four discrete sets of discovery, three of which were filed in the 22-day period between August 18 and September 8, 2023. Defendant Dixon hereby provides his detailed

rebuttal to each of the alleged 11 defects and the 24 individual discovery responses items as outlined in Plaintiff's Motion to Compel. [Doc. 94].

## ALLEGED GENERAL DEFECTS

1.      Misconstrued the time scope of this case as covering only the time after October 15, 2020, when Plaintiff Phillips was transferred to Suwannee C.I.

**Response:** The language in the First Amended Complaint (FAC) [Doc. 25] states that "discrimination and violations followed Plaintiff [from Northwest Florida Reception Center] upon his transfer to Suwannee CI, which form the basis for this new action." (¶41, FAC) Plaintiff also states here that his previous lawsuit filed in 2018, <u>Phillips v. Inch, et al.</u>, Case No. 4:18cv139-AW-CAS, covered events only through December 2019.

However, what Plaintiff does not mention here is the Settlement Agreement and Release with the Florida Department of Corrections he signed on February 16, 2022, voluntarily dismissing all claims arising from this suit. *Ex. 1, Settlement*. More important, by signing this agreement Plaintiff admitted he:

> discharged…the Florida Department of Corrections… of and from any and all claims, actions, causes of actions, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, including attorney's fees, which the undersigned now has or which may hereafter accrue on account of or in any way growing out of the events and injuries that were at issue in this action, including any and all known and unknown, foreseen and unforeseen bodily and personal injuries.

Despite knowing the language to which he had agreed in February 2022, as well as the financial settlement he received, Plaintiff filed his present complaint in November 2022 containing the precise language and the precise issues he had raised in 2018. Therefore, Defendant Dixon believes Plaintiff has identified this alleged defect in error, if not in bad faith.

2.    Failed to provide training records and training materials on disability issues (relevant to Secretary Dixon's failure to accommodate disabilities).

**Response:** Plaintiff apparently believes in things that *should* be in a perfect world rather than in things that *are* in the real world. This alleged defect is an excellent example of this theory. In the FAC, Plaintiff states that Defendant Dixon failed "to implement adequate training to ensure his subordinates would remain vigilant to Plaintiff's constitutional needs." (¶ 54). Therefore, if Defendant Dixon failed to provide adequate training on "disability issues," then he cannot now provide training records.

Further, the bare allegation that Defendant Dixon failed to accommodate disabilities is without strict proof, documentary or otherwise, and Plaintiff has thus far produced no evidence in support of this allegation other than the self-serving claims in the FAC. This second alleged defect is therefore also without merit.

3.    Referred to large masses of records, such as medical records, simply stating that the responsive records could be found somewhere in the stack.

**Response:** Plaintiff continually cites Velez v. Bank of Am., No. 8:18-cv-88-T-35SPF (M.D. Fla. Oct. 4, 2019), as the reason Defendant Dixon must search through thousands of pages of medical records and remove those documents responsive to specific discovery requests. Plaintiff even quotes the portion of the Velez case he believes is relevant here: "If Plaintiffs have already produced the documents, they must specifically identify which documents are responsive to the request and where they are located **in the folders provided**." Velez v. Bank of Am., No. 8:18-cv-88-T-35SPF, at *7 (M.D. Fla. Oct. 4, 2019) (emphasis added). Unlike the Velez plaintiffs, however, whose Dropbox consisted of a sizeable collection of disparate, disorganized, and largely unrelated folders containing equally unrelated documents, Defendant Dixon has produced Plaintiff's medical documents in readily identifiable folders. While it is certainly true that this file contains a substantially large number of pages, it nevertheless constitutes a single, coherent, and generally chronological file dedicated solely to Plaintiff's medical and psychological history since he was first incarcerated with FDC.

Therefore, Velez does not support Plaintiff's claim, and Defendant Dixon believes that Plaintiff can more easily find specific pages within his own medical documents than attempting to compel Defendant Dixon to do so.

4

4.      Failing to provide records of other cases, including cellulitis infections, to show the ubiquity of Plaintiff's problem (could be provided with identifiers redacted).

**Response:** Plaintiff has assumed that Defendant Dixon has the means, through former defendant Centurion, to create a list of all inmates at Suwannee CI Annex where Plaintiff was incarcerated during the relevant period of this lawsuit, who suffer from cellulitis. Despite Plaintiff's misplaced belief, creating such a list is not possible by means other than a search of all inmates' medical files. Rather than allegedly corroborating the "ubiquity" of Plaintiff's cellulitis, a list of other inmates with cellulitis would show nothing useful unless these inmates contracted cellulitis in the same manner as Plaintiff, with the same degree of severity, with the same treatment protocol. This request violates the personal health privacy of those other inmates, is irrelevant to Plaintiff's lawsuit, and would be unduly burdensome. Therefore, this alleged defect as stated is without merit.

5.      Failing to provide relevant communications (especially emails) that are known to be the most frequent media of grievance review investigations.

**Response:** Plaintiff once again assumes facts that have not been proven to be true in general, and certainly not with specificity in regard to this complaint. In accordance with Chapter 33-103, Florida Administrative Code, inmate grievances are processed at three levels: informal; formal; appeal or emergency medical appeal.

5

It is true that staff in the Bureau of Policy Management and Inmate Appeals processing grievance appeals will usually email the appropriate individual in the Office of Health Services to review the grievance and issue an opinion after consulting with a medical professional when appropriate and then respond via email to the grievance coordinator. It is equally true that a grievance coordinator may email the warden at an institution a copy of a formal grievance but will more often hand-deliver it. Grievances at the informal level rarely involve email communication, however. Where emails exist, they are almost always used to transmit the grievance to the next step in the process. They rarely if ever discuss any issues within the grievance. Those concerns, when they exist, are incorporated into the grievance response itself.

Defendant Dixon did indeed request any emails or other communication associated with Plaintiff's grievances, and there were none. Despite Plaintiff's contention regarding what is "known," the fact remains that no such emails were found. Therefore, this alleged defect as stated is without merit.

6.      Invoking "privilege" in declining to produce categories of documents but failing to log records deemed as privileged in a privilege log.

**Response:** Plaintiff has noticeably failed to identify a single discovery response where Defendant Dixon refused to produce documents on the basis of alleged "privilege." Defendant Dixon states that the only time such a claim would

be made is in the context of "attorney-client privilege" documents, and he has not done so. Therefore, he has no need whatever of a privilege log, and this alleged defect is clearly false and without merit.

7.      Declining to produce information and records relating to actions by FDC medical contractors relating to disability accommodations as being outside the scope of the Secretary's responsibilities.

**Response:** Centurion has provided medical care to inmates in state institutions since its original contract in early 2016. Centurion was also a defendant in this case when it was originally filed on September 15, 2022, and filed its Motion to Dismiss on January 31, 2023. [See Docs. 51, 52, 53, 54, 59]. Plaintiff voluntarily dismissed Centurion from this suit on the next day, February 1, 2023, and the Court followed with its Order on February 2, 2023. [Doc. 61]. In light of the emphasis on Plaintiff's various medical conditions, his medical treatment, his medical supplies, and the volume of medical records and related documents Plaintiff requested during discovery, it seems decidedly odd that he chose to immediately dismiss the health care provider from his suit.

Instead, Plaintiff chooses to rely solely on the theory that Defendant Dixon has a "non-delegable duty to accommodate disabilities under the ADA." However, Plaintiff continues to obviously conflate and commingle issues that are medically related and those which relate to specific ADA matters. Even in the case of the latter,

the only evidence of any alleged violation of ADA arises, again, from Plaintiff's own self-serving opinions unsupported by any corroborating evidence.

Further, Plaintiff's 1st Set of Discovery to Centurion and its individual defendants *(Ex. 2, Plaintiff's 1st Discovery to Centurion, Ex. 3, Plaintiff's 1st Discovery to Medical Individuals)* contains the identical requests for documents and interrogatories that were then served on Defendant Dixon in the 2nd, 3rd, and 4th Sets of Discovery filed after Centurion's dismissal in February 2023 and Plaintiff's Motion for Preliminary Injunction filed on August 18, 2023. [Doc. 74]. Plaintiff filed this motion because Defendant Dixon was "refusing to comply with tis *[sic]* internal policies and legal obligations to provide Plaintiff Donny Phillips with a required transfer to a specialized transfer to a specialized wound-care facility, appropriate medical care, and necessary mobility devices." With the glaring absence of Centurion as a defendant, this injunction blamed Defendant Dixon for all of these alleged omissions. The Court denied Plaintiff's motion in its entirety on September 12, 2023. [Doc. 89]. This alleged defect is therefore without merit and may also be seen as deliberately misleading.

8.      Declining to produce records that are not in Defendant Dixon's "possession" although they may be within Defendant Dixon's "custody or control" or records to which Dixon has a legal right under Rule 34 to obtain – such as records generated by its private health contractor Centurion.

**Response:** Had Plaintiff not voluntarily dismissed Centurion from this suit within one day of Centurion's Motion to Dismiss, obtaining any and all medical records, whether they were specifically related to Plaintiff or not, provided that the required universal HIPAA order was in place, would have been remarkably simple. See discussion in Defendant Dixon's response to No. 7, above.

Because Plaintiff chose to dismiss Centurion, he is left with trying to claim the non-delegable duty on the part of Defendant Dixon regarding ADA and the fact that Defendant Dixon can access and therefore produce Centurion's documents. In a significant number of cases, although not all as Plaintiff wishes, Defendant Dixon has indeed produced documents relevant to specific discovery requests.

Plaintiff is therefore hampered now by his own decision and wishes to shift the emphasis from former defendant Centurion to Defendant Dixon, again conflating ADA matters with medical ones. This alleged defect is also without merit.

9.    Declining to produce statewide data on wound care in Florida prisons as noted in the FDC Wound Care program document as being collected.

**Response:** Defendant Dixon objected to this specific request on several grounds, and Plaintiff apparently disagrees. Additionally, the subject of wound care in Florida correctional institutions is a medical and not an ADA issue. Statewide data is irrelevant to this lawsuit. Therefore, this alleged defect is without merit.

10.     Declining to list the benefits, services, programs, and activities that would be available to non-disabled inmates and, with accommodations, to disabled inmates.

**Response:** Defendant Dixon responded to this Interrogatory sufficiently and has no other response to offer. However, he would remind Plaintiff that he received documents during inmate intake when he transferred to Suwannee CI Annex in October 2020 and Columbia CI Annex in August 2023 that specifically detail every benefit, service, program, and activity offered, the means to access them if required, and related information. Therefore, this alleged defect is without merit.

11.     Agreement to provide the criteria on which Columbia C.I. Annex was selected as a placement for Plaintiff after he was moved from Suwannee C.I. Annex.

**Response:** This defect is unclear as written. However, Defendant Dixon states that he did indeed agree to investigate and provide relevant documentation used to select Columbia CI Annex for Plaintiff's transfer. The only alleged defect here appears to be that these criteria have not yet been produced. Defendant Dixon will also point out that Plaintiff has consistently and stridently insisted that his placement in administrative confinement and subsequent transfer to Columbia CI Annex for his own safety after reporting he had been assaulted by an inmate was instead retaliation for having met with his attorney on August 2, 2023, and for filing a motion for preliminary injunction on August 18, 2023. Since Plaintiff's transfer had already

10

been recommended well before August 18, this last part is a specious claim. Therefore, this alleged defect is also without merit or the slightest basis in fact.

## ALLEGED DEFECTIVE INDIVIDUAL REPONSES

Defendant has reproduced the individual responses with which Plaintiff has sufficient issues to allegedly warrant his motion and added his responses to each.

**Plaintiff's 1ˢᵗ Set of Discovery Requests to Defendant Dixon:**

| RFP | Response |
|---|---|
| 13. All personnel records for the individual defendants, including records relating to or concerning disciplinary and corrective actions taken against any of the individual defendants. | **Response: Redacted personnel files for the individual defendants Richardson, Aldridge, and Hawthorne are being produced.** |

BASIS TO COMPEL: Contact information for the individual defendants' personal references are completely redacted in the personnel files.

**RESPONSE:** The "personal references" to which Plaintiff refers are those Defendants Richardson, Aldridge, and Hawthorne provided on their employment applications and related documents. Plaintiff stated that he requires this information in order to contact these references and discuss the defendants. Defendant Dixon objects to providing this information on the basis that it is irrelevant to the issues raised in this lawsuit and will not lead to any admissible evidence.

Further, Plaintiff has had at least nine months to request this specific information and, in the case of Defendant Richardson, he could have asked her about her "personal references" during her deposition. It is interesting to note that the

redacted portion identifying these references appeared only on Defendant Richardson's initial application for employment in February 2008, thus making the alleged need to know their identities some 15 years later suspect. However, the employment verification records, which would logically be more relevant to Plaintiff's purposes, were provided for all three Defendants.

| RFP | Response |
|-----|----------|
| 14. All training records for the individual defendants. | **Response: Training records and documents related to training are included in the personnel files being produced in response to Request 13.** |

BASIS TO COMPEL: There are no training records (either lists of classes taken or training materials) in the individual defendants' personnel files.

**RESPONSE:** Defendant Dixon states that there are indeed training records in the individual defendants' personnel files. For example only, Defendant Richardson's training records are found beginning on page 150 through 160.

However, Defendant Dixon understands that the training records to which Plaintiff refers are the non-existent records for non-existent training regarding how to treat disabled inmates. Defendant Dixon also refers to his more specific response to the "Alleged Defects" No. 2.

| RFP | Response |
|---|---|
| 32. Post orders applicable to the individual defendants. | **Response: Copies of post orders for the various posts where the individual defendants worked from October 15, 2020, through November 17, 2022, are being produced.** |

BASIS TO COMPEL: Only Post Orders 11, 12, and 13, were produced. Plaintiff is aware of Post Orders 1, 9, and 10 (General, Officer, and Sergeant Post Orders) that certainly must apply and there are undoubtedly others.

**RESPONSE:** Defendant Dixon states that after verifying the posts for Defendants Richardson, Aldridge, and Hawthorne since Plaintiff arrives at Suwannee CI Annex on October 15, 2020, he determined that they worked and still work in close, protective, and maximum management posts that are specifically covered by the post orders produced for both correctional officers and correctional officer sergeants.

However, Defendant Dixon will produce post orders 1, 9, and 10, although they do not apply to these three Defendants and have been produced to Plaintiff's counsel in a similar, active lawsuit.

| RFP | Response |
|---|---|
| 34. Dormitory logs for Plaintiff's dormitory for the dates in Request No. 33. | **Response: Copies of the dormitory logs for the dates identified in Request 33 have been requested and will be produced upon receipt.** |

BASIS TO COMPEL: Dormitory logs are lists of routine and non-routine activities in the Dorm. No dormitory logs have been produced.

13

**RESPONSE:** Defendant Dixon will follow up again with the appropriate officials at Suwannee CI Annex for the dormitory logs for the dates indicated by Plaintiff. However, the initial request for these dorm logs was made to Suwannee CI Annex sometime in late January or February 2023. It is entirely possible since the dates cited by Plaintiff were between October 2020 and March 2021 that these documents have been destroyed in accordance with the Department's retention schedule. If that is indeed the case, Defendant Dixon will produce the applicable records retention schedule, as well as the specific page documenting the destruction of these records.

| RFP | Response |
|---|---|
| 37. All documents related to cellulitis infections at the Facility between January 1, 2020, to present. | **Response: Documents concerning cellulitis infections in general at Suwannee CI Annex from January 1, 2020, through November 17, 2022, have been requested and if they exist, will be produced. No documents regarding cellulitis in specific inmate cases will be produced.** |

BASIS TO COMPEL: Documents concerning cellulitis infections in general at Suwannee CI Annex from January 1, 2020, through November 17, 2022, have not been produced. Documents that contain names of specific inmates can be produced with identifiers redacted consistent with the requirements of HIPAA rules.

**RESPONSE:** Defendant Dixon will follow up with the appropriate personnel at Suwannee CI Annex to verify that documents regarding the number of cellulitis occurrences exist for the designated time period and therefore can and will be

14

produced, or do not exist other than in individual inmates' medical files. In the latter case, no documents will be produced.

| RFP | Response |
|---|---|
| 39. Documents sufficient to show the number of pull-up diapers issued at the Facility in 2020, 2021, and 2022, including the number each recipient received per day. | **Response: If such documents as described herein exist, they will be produced as they reflect the numbers issued in general. No documents will be produced as they relate to individual inmates.** |

BASIS TO COMPEL: Responsive documents have not been produced. Documents that contain names of specific inmates can be produced with identifiers redacted consistent with the requirements of HIPAA rules.

**RESPONSE:** Defendant Dixon will follow up the appropriate personnel at Suwannee CI Annex to verify that documents regarding the number of adult pull-up diapers issued from January 1 to December 31 of 2020, 2021, and 2022. If there is also documentation already in existence outside of inmates' medical files that show how many adult pull-up diapers were issued to each recipient during this same period, this documentation will either be produced or the response will remain "None."

| RFP | Response |
|---|---|
| 40. All documents and communications between January 1, 2020, to present, between your personnel at the Facility and any other person relating in whole or in part to requests for pull-up diapers, use of pull-up diapers at the Facility, and issuance of pull-up diapers to inmates. | **Response: None.** |

BASIS TO COMPEL: Information relating to the procurement and distribution of these items must be in Defendant Dixon's control. Documents that contain names of specific inmates can be produced with identifiers redacted consistent with the requirements of HIPAA rules.

**RESPONSE:** Defendant Dixon reiterates that there are no documents responsive to this poorly worded and convoluted request. He has no idea whatsoever what Plaintiff means by "your personnel" at Suwannee CI Annex, and objects to the utterly ambiguous designation of "any other person." Further, the request does not mention inmates at all, yet the Basis to Compel repeats the language used in several previous bases to compel referring to redacting inmate identifiers.

Defendant Dixon will maintain his original response absent a more precise and identifiable request. Defendant Dixon will also point out that the issuance of adult diapers of any kind is a medical issue and not an ADA issue as it relates to the entire inmate population at Suwannee C Annex. This is another example of conflating and commingling these two issues in order to achieve the maximum result from Defendant Dixon. Had former defendant Centurion not been so hastily

16

dismissed, Plaintiff would likely have had better luck with many of his requests, as evidenced by the documents in Exhibit 15.

| RFP | Response |
|-----|----------|
| 41. All documents and communications between January 1, 2020, to present between your personnel at the Facility and any other person relating in whole or in part to bladder or bowel incontinence. | **Response: None.** |

BASIS TO COMPEL: Most likely, the same documents on orders and distributions of diapers will show the number of inmates who are incontinent of bladder and/or bowel. Documents that contain names of specific inmates can be produced with identifiers redacted consistent with the requirements of HIPAA rules.

**RESPONSE:** Defendant Dixon reiterates his position as stated immediately above. This request is as poorly worded and largely incomprehensible as the one regarding diapers. Absent a request that is more precise, Defendant Dixon maintains his original response of "None" and his statement regarding the conflation and commingling of medical and ADA issues.

| RFP | Response |
|-----|----------|
| 42. Documents sufficient to show the following with respect to each prisoner diagnosed with bladder or bowel incontinence: (a) the identity of the patient suffering from bladder or bowel incontinence; (b) the date of diagnosis of bowel or bladder incontinence; (c) the course of treatment of bladder or bowel incontinence; and (d) all medical personnel involved in the treatment of bladder or bowel incontinence. | **Response: Objection. This request is not only overbroad and unduly burdensome, but it is also in violation of HIPAA as it relates to other inmates. Such information regarding other inmates is also not likely to lead to any admissible evidence regarding Plaintiff. Finally, such statistics regarding inmates diagnosed with incontinence or any other specific ailments, particularly as a means to identify them, are not kept in any form.** |

BASIS TO COMPEL: The same documents that would show who is getting diapers would substantially show who is incontinent. They should be produced even if the identifiers are redacted and the unredacted records filed under seal. Even if parts a and b are burdensome, c and d would not be.

**RESPONSE:** Defendant Dixon states that this request remains overbroad and unduly burdensome, regardless of Plaintiff's uninformed and self-serving opinion that parts of this request are indeed not objectionable on any grounds. Further, Defendant Dixon states that the identity, medical history, treatment regimen, and medical personnel treating other "prisoners" suffering from bladder or bowel incontinence is not only a significantly blatant violation of HIPAA but also a purely medical issue separate and apart from ADA. Any such information, even with "identifiers" heavily redacted, will not reasonably lead to any admissible evidence at trial, or even for the purposes of dispositive motions. Defendant Dixon therefore

18

reaffirms his original objection.

| RFP | Response |
|---|---|
| 45. All documents or communications with the Medical Defendants concerning the settlement agreement in the matter of *Disability Rights Florida, Inc., v. Jones*, Case No. 2019-CA-2825, Second Judicial Circuit in and for Leon County, Florida, dated November 8, 2021. | **Response: None.** |

BASIS TO COMPEL: Plaintiff is aware that he communicated repeatedly on this subject himself and so it is not possible that there are no documents. This agreement is the basis for treatment of prisoners with disabilities, such as mobility, and should be a part of the orientation of each prison employee.

**RESPONSE:** Defendant Dixon reminds Plaintiff that there are no longer any "Medical Defendants" since Plaintiff chose to voluntarily dismiss them all on February 1, 2023. Defendant Dixon did not and does not base his original response on Plaintiff's allegation that he "communicated repeatedly" regarding this lawsuit or his declaration that it is somehow impossible that there are no documents. Defendant Dixon notices that Plaintiff does not state with whom he repeatedly communicated, but that is irrelevant because this request asked for Defendant Dixon's communications with Centurion regarding the settlement agreement only. Further, Defendant Dixon states that the settlement agreement between FDC and Disability Rights Florida was signed on November 8, 2021, by Assistant General Counsel Sean Anderson, who represented the agency throughout this entire

19

litigation. He also reminds Plaintiff that he was not appointed secretary until November 21, 2021.

| RFP | Response |
| --- | --- |
| 47. All documents and communications with the Medical Defendants concerning any changes to policy or practice for ADA inmates concerning, relating to, arising from, or in connection with the settlement agreement or lawsuit referenced above in Request No. 45. | **Response: None.** |

BASIS TO COMPEL: Given that Plaintiff himself has raised this issue repeatedly in medical grievances that have been responded to, at times, by medical staff, it is not possible that there are "None."

**RESPONSE:** Defendant Dixon reiterates most of his comments in response to Plaintiff's objections to RFP 47, immediately above. Regardless of whether Plaintiff filed repeated medical grievances has nothing to do with Defendant Dixon's communications with the former medical defendants about any policy or practice changes arising from the Disability Rights Florida settlement agreement.

| RFP | Response |
| --- | --- |
| 48. All communications relating to Plaintiff's informal and formal grievances and appeals from January 1, 2020, to present. | **Response: None.** |

BASIS TO COMPEL: It is well established that institutional and central office grievance reviewers frequently communicate with medical staff and review records sent back and forth, usually by e-mail, it is not possible that there are no such

communications.

**RESPONSE:** Defendant Dixon refers Plaintiff to his detailed response to No.

5 in the Alleged Defects portion of this response. He once again iterates that he

requires considerably more factual information to modify his original response than

Plaintiff's unsupported claims that anything concerning a process, including the

grievance process, is "well-established" and therefore there must be documents to be

produced.

| RFP | Response |
|---|---|
| 51. All communications with ADA coordinators or personnel staffed by you or your contractors or agents concerning or relating to Plaintiff. | **Response: Responsive documents will be produced.** |

BASIS TO COMPEL: No such documents have been produced.

**RESPONSE:** Defendant Dixon will follow up with the appropriate ADA

coordinators to determine when these documents will be produced and insist on a

reasonably quick delivery.

| RFP | Response |
|---|---|
| 53. All documents relating to any assessments or determinations taken concerning Plaintiff in connection with the specific procedures outlined in Procedure 403.011. | **Response: Any assessments or determinations involving Plaintiff in connection with Impaired Inmate Assistants as outlined in Procedure 403.011 would be in Plaintiff's medical file, if they exist.** |

BASIS TO COMPEL: Just as one example, screening of prospective Impaired

Inmate Assistants would require reviewing information in their files such as gang

membership or details from the crime of conviction that would not normally be made public. It is not credible that assessments and determinations would end up in Plaintiff's medical file, which is open to him, since they involve administrative decisions that are often stamped "Do Not Share with Inmate."

**RESPONSE:** Defendant Dixon states that the example offered to support compelling production of documents is disingenuous at best, and at worst it is clearly misguided. Assessments used to select inmates to serve as impaired inmate assistants (IIA) according to Procedure 403.011, including any gang activity, are irrelevant to Plaintiff's requesting, in writing, being assigned an IIA. Defendant Dixon suggests that the documents Plaintiff requested were in reality any assessments on his status as a mobility-impaired inmate needing an IIA.

Defendant will follow up with the appropriate individuals most familiar with this process regarding available and appropriately relevant documents and ask that if they exist, where they may be located. If these assessments are indeed in Plaintiff's medical file, or in his classification file, Defendant Dixon will amend his original response accordingly.

| RFP | Response |
|---|---|
| 54. All documents relied upon in making any determinations or assessments regarding ADA accommodations or compliance with Procedure 403.011. | **Response: Procedure 403.011, Impaired Inmate Assistants, is not a reasonable accommodation but a medical decision made by Centurion staff, who review an inmate's medical records to determine if an assistant is warranted. Thus, there are no** |

|  | **records to be produced.** |
|---|---|

BASIS TO COMPEL: To say the assignment of Impaired Inmate Assistants is not a reasonable accommodation is on par with telling mobility-impaired inmates that they are not qualified persons with a disability. This may be the opinion of some prison staff and administrators who apparently have few resources and little training (to judge by personnel records) on which to base that opinion.

RESPONSE: Defendant Dixon agrees that his original response is neither clear nor complete and will revise it accordingly. If any additional documents relied on in assessing Plaintiff's medical condition and if he qualifies for having an IIA, they will be identified and produced. If there are no additional documents other than Plaintiff's medical records, Defendant will convey this to Plaintiff.

**Plaintiff's 2ⁿᵈ Set of Discovery Requests to Defendant Dixon:**

| RFP | Response |
|---|---|
| 6. A copy of the job description for each individual at Suwannee CI whose job involves, in whole or in part, working on issues relating to ADA inmates and the accommodation of disabilities. | **Response: Objection as to being overly broad, unduly burdensome, and unlikely to lead to the discovery of admissible evidence. If Plaintiff can identify precise individuals relevant to this action, job descriptions will be provided for individuals employed by FDC. Defendants have already provided personnel files for Defendants Richardson, Aldridge, and Hawthorne.** |

BASIS TO COMPEL: Secretary Dixon has superior access to records that identify "precise individuals", but Plaintiff has no such access and has to identify

such persons by their function. This is what we believe we have done.

**RESPONSE:** Defendant Dixon agrees that he has access to job descriptions and can certainly produce them. However, he states that to his knowledge, the position descriptions for all levels of security staff are standard and must conform to the position descriptions promulgated by the Florida Department of Management Services. He is not aware of any indices in any security staff position descriptions relating to "working on issues relating to ADA inmates and the accommodation of disabilities."

However, Defendant Dixon will contact Human Resources at FDC and inquire if any non-security employees at Suwannee CI Annex have position descriptions that include these specific parameters. If so, they will be produced.

| RFP | Response |
|---|---|
| 12. As to the "Wound Program" document (Exhibit A) for 2020-present:<br>a. Wound data collected, tracked and trended for report and presentation at the Statewide Quality Management Meeting as required by Part II-B-2 of Exhibit A;<br>b. Materials used in the "wound prevention and wound care education and training for staff" as provided in Part II-C-2 of Exhibit A;<br>c. All "recommendations for wound care protocols and wound program" as provided in Part II-C-3 of Exhibit A;<br>d. A blank copy of the Monthly Wound Report, DC4-810, and copies of DC4-810 reports for Plaintiff;<br>e. All DC4-701 and DC4-714A biweekly records evaluating the progress of wound healing for Plaintiff as required by Part II-D-3 of Exhibit A;<br>f. All Braden Scale form (DC4-732) evaluations filled out for Plaintiff as required by Part III-A-1-a of Exhibit A;<br>g. All "Wound Evaluation and Treatment Record" and "Pain Management" sections relating to Plaintiff on form DC4-684 and DC4-701A required by Part III-A-2-a and e of Exhibit A;<br>h. All "Wound Treatment Documentation" required by Part III-A-3-a- d of Exhibit A;<br>i. All "Outpatient Wound Evaluation/Treatment" encounters documented on form DC4-811 for Plaintiff per Part III-C, Exhibit A[;]<br>i.  j. Any notification by the Suwannee Chief Health Officer/Medical Director to the Regional Medical Director relating to Plaintiff and any of the criteria listed in Part IV-C of Exhibit A. | **Response: Objection to subparts (a), (b), (c) as to relevance and being overly broad. Responsive documents for parts (d), (e), (f), (g), (h), (i), and (j) may be found in Plaintiff's medical records. Undersigned counsel is continuing to request responsive materials, if any exist outside of the above indicated files, and will supplement as necessary upon receipt.** |
| i. All "Outpatient Wound Evaluation/Treatment" encounters documented on form DC4-811 for Plaintiff per Part III-C, Exhibit A[;]<br>j. Any notification by the Suwannee Chief Health Officer/Medical Director to the Regional Medical Director relating to Plaintiff and any of the criteria listed in Part IV-C of Exhibit A. | |

BASIS TO COMPEL: Parts a, b, and c, are specifically set out as being data

that is collated and maintained and appears to be relevant in that the program has apparently been discontinued and the records sought would speak to the need for the program and its application to Plaintiff's severe tissue infection that flares up every few months and has never completely disappeared. Cellulitis is potentially deadly in that it can result in blood and bone infection and gangrene and septic shock and amputation and potentially death. As to the records that "can be found in Plaintiff's medical file," a producing party cannot simply refer to a large body of records and say that the responsive records are somewhere in the stack. *Velez v. Bank of Am.*, No. 8:18-cv-88-T-35SPF, at *7 (M.D. Fla. Oct. 4, 2019) ("If Plaintiffs have already produced the documents, they must specifically identify which documents are responsive to the request and where they are located in the folders provided.").

**RESPONSE:** Defendant Dixon will agree to follow up with FDC's Office of Health Services regarding the availability of documents as specifically identified in sections (a), (b), (c), and (d), and will produce them if they are indeed available. However, the documents identified in sections (e) through (j) are found in Plaintiff's medical file. Despite Plaintiff's earnest and dogged reliance on <u>Velez</u> as his reason to compel Defendant Dixon to search for specific documents within Plaintiff's medical file, he will not do so. Rather, Defendant Dixon directs Plaintiff's attention to his detailed discussion of the applicability of Velez in "Alleged General Defects, No. 3.

26

| Interrogatory | Response |
|---|---|
| 1. Please identify and describe each and every benefit, service, program, and activity that would normally be available to inmates with mobility impairments and incontinence of bladder and bowel at Suwannee C.I. and Annex and the methods by which they can be requested. | **Response: All inmates have access to the inmate request system. This process involves the same form at every institution for an inmate to request anything. The form is submitted through institutional mail and institutional staff will respond. Every inmate goes through an orientation process when they arrive at an institution which includes details of this mail process for the inmate to submit an inmate request, sick call, grievance, outgoing mail to family, etc.** |

BASIS TO COMPEL: Defendant does not object to the first part of the Interrogatory, asking for identification of benefits, services, programs, and activities, but simply ignores it. "Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed.R.Civ.P. 33(b)(3).

**RESPONSE:** Defendant Dixon will agree to modify his response to this particular Interrogatory to the extent he discussed it in his response to Alleged General Defects, No. 10. However, he will also obtain copies of the orientation documentation provided to Plaintiff each time he is transferred to a new institution to confirm which specific benefits, programs, services, and activities are provided to all inmates regardless of ADA status, specific impairment, or need for an accommodation.

| Interrogatory | Response |
|---|---|
| 2. Please identify and describe each and every physical or mental condition or diagnosis that is considered to constitute a disability that Plaintiff is deemed to now have or has ever been deemed to have during his current incarceration and for each such condition or diagnosis, please identify the physician(s) who diagnosed the condition(s), identify each physician(s) with whom he treated for each condition(s), and identify each physician(s) who classified him as "disabled" (to the extent physicians determine that classification). | **Response: Objection as to relevance of time periods outside of the current litigation as Plaintiffs Amended Complaint focuses on the time since his October 15, 2020, transfer to Suwannee C.I., which he states "form[s] the basis for this new action." Doc. 25, 41. Notwithstanding the objection, all of the requested information can be found in Plaintiffs medical file.** |

BASIS TO COMPEL: The above response, construing the Amended Complaint as covering only post-October 15, 2020, is based on a misquote. Defendant quotes the First Amended Complaint (ECF 25, ¶ 42, as saying that the transfer to Suwannee C.I. "form[s]" the basis for this new action. "Forms" is a verb that applies to a singular subject. What Plaintiff actually stated was that "the discrimination and violations followed Plaintiff upon his transfer to Suwannee C.I., which form the basis for this new action." The verb "form" reflects a plural subject and clearly references "the discrimination and violations" that followed Plaintiff to Suwannee C.I. The language does not suggest they began there. The history of Plaintiff's impairment and retaliatory failure to accommodate is relevant to the allegations in this case – not just the history beginning at his transfer.

**RESPONSE:** Defendant Dixon admits he has rarely seen such a convoluted and decidedly pedantic effort to justify ***not*** limiting Plaintiff's medical issues and

impairments, plus alleged retaliation, to his transfer to Suwannee CI Annex beginning on October 15, 2020. He already addressed this non-issue in his detailed response to Alleged General Defects, No. 1, with the primary reason for this precision of the time period arising from the Settlement Agreement he signed on February 16, 2023.

| Interrogatory | Response |
|---|---|
| 5. Please describe in detail the factors involved in the decision to discontinue Plaintiff's status as an ADA inmate, identify the persons involved in making that decision, and the ways in which the change in status affects Plaintiff. | **Response: As to discontinuing his ADA status, Plaintiff should refer to his medical file which would indicate the physicians who determined his medical grades.**<br><br>**The people involved in this medical grade decision are Plaintiff's physicians handling the individualized assessment at that time. The individuals at the Plaintiffs institution include an impaired inmate nurse who is responsible for coordinating and training assistance. This individual also chairs the quarterly disabled inmate meetings which provide inmates an opportunity to appear and discuss their incarceration as it relates to their specific needs.**<br><br>**Classification staff at the institution will receive a DC4-706 health services profile form, which informs them of the inmate's medical grade determined by the physician. There is an indicator on the form when there is a change in grade. Management will review to ensure there is not a conflict with that inmate's ability to be housed at that institution. If there is, the inmate will be transferred to an appropriate institution.**<br><br>**Central office staff typically only get involved when there is a profile conflict due to the changed grade of an inmate which will result in the inmate being transferred to an appropriate institution.** |

|  | **See Health Services Bulletin 15.03.25 for an overview for inmates with disabilities or impairments. See also Health Services Bulletins 150325.01, 15.03.25.02, and 15.03.25.03 regarding auditory, mobility, and v1s1on, respectively. (Previously produced)** |
|---|---|
|  | **Changes in an inmate's health grade are purely the result of the physician, who is employed by Centurion.** |

BASIS TO COMPEL: Defendant ignores the part of the Interrogatory that requests identity of persons. It does not object to that part of the Interrogatory but simply ignores it. "Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed.R.Civ.P. 33(b)(3).

**RESPONSE:** Defendant Dixon agrees that his original response does not identify the names of former defendant Centurion's medical professionals who evaluated Plaintiff and, post-assessment, assigned him an appropriate medical grade. That individual would of course have been Centurion employee and former defendant Dr. Alexis Figueroa, now the Region II Medical Director.

**Plaintiff's 3rd Set of Discovery Requests to Defendant Dixon:**

| RFP | Response |
|---|---|
| 5. All records, including electronically stored information, in your possession, custody, or control, both at the institutional and central office level relating to the transfer of Plaintiff from Suwannee Annex to Columbia Annex (with timely updates to the end of discovery). | **Response: Undersigned is following up with the proper FDC individual(s) regarding this request and will produce any audio and video, to the extent any exists. See also Plaintiff's updated classification file produced in Response to No. 9 of Plaintiff's Second Request for Production.** |

30

BASIS TO COMPEL: Plaintiff received no relevant communications. Among the electronically stored records are massive numbers of communications that have gone back and forth relating to Plaintiff for the past several years. Plaintiff's requests for e-mail communications have apparently never been submitted to the IT department at FDC which has always in the past found thousands of e-mails, many of which were relevant and some material. Plaintiff will produce a log describing e-mails from Plaintiff's prior lawsuit as an example.

**RESPONSE:** Defendant Dixon agrees to follow up with the appropriate individuals to make certain all documents relating to Plaintiff's August 28, 2023, transfer to Columbia CI Annex are produced as soon as possible.

However, Defendant Dixon disputes the completely unfounded claim that "Plaintiff's requests for email communications have apparently never been submitted to the IT department at FDC…." and would demand any proof that such a failure to submit ever occurred in relation to this case. Defendant Dixon is also unpersuaded by Plaintiff's claims of "thousands of emails" produced during his pervious lawsuit is indicative of anything relevant here. If this is indeed the case, Defendant Dixon suggests that since discovery first began in January 2023 and Plaintiff has been requesting email communications steadily since then, he should have couched his requests for emails to Defendant Dixon in this case with the exact parameters, search terms, and other data he used in his 2018 lawsuit. Waiting until

the day discovery ended to complain in such terms is not only futile but also disingenuous.

| RFP | Response |
| --- | --- |
| 8. All records, including electronically stored information, in your possession, custody, or control, both at the institutional and central office level sufficient to show the criteria on which Columbia C.I. Annex was selected as the institution for Plaintiff's transfer. (with timely updates to the end of discovery). | **Response: Undersigned is following up with the proper FDC individual(s) regarding this request and will produce any records, to the extent any exists.** |

BASIS TO COMPEL: No such records were produced. There are policy guidelines for inmate placement but for the last eight years, Plaintiff, an elderly, chronically ill, and disabled, nonviolent inmate, has been through some of the roughest prisons in North Florida: Franklin C.I., Northwest Florida Reception Center, Suwannee C.I., and Columbia C.I. These are prisons for serious violent offenders while Plaintiff is a non-violent, elderly, disabled, chronically ill prisoner serving a sentence of a non-violent offense. The only thing that keeps him from going to a prison where he could get compassionate and professional geriatric treatment is that he is a persistent writ-writer, someone who writes grievances and files lawsuits. Defendant Dixon could provide a set of parameters that determine where inmates are assigned but has not done so in response to this clear invitation.

**RESPONSE:** Defendant Dixon agrees to follow up with the appropriate individuals who determine inmate placement for any and all documents that specify parameters used in making such decisions and require these documents be produced

as quickly as possible.

**Plaintiff's 4th Set of Discovery Requests to Defendant Dixon:**

| Interrogatory | Response |
|---|---|
| 2. Please state all reasons for discontinuing the provision to Plaintiff of the original set of sanitation supplies called for in the Preliminary Injunction issued in *Phillips v. Inch*, Case No. 4:18cv139-MW-CAS, ECF 198, or reducing them in type, amount, or number, declining to provide him with pull-up diapers, and the reasons for declining to re-issue passes for bathroom and shower access, high-topped therapeutic boots, from 1/1/2020 to the present. | **Response: Objection as to relevance of time periods outside of the current litigation as Plaintiffs Amended Complaint focuses on the time since his October 15, 2020, transfer to Suwannee C.I., which he states "form[s] the basis for this new action." Doc. 25, 41. As to the relevant time period, this interrogatory is phrased with false assumptions. The determination of a need for pull-up diapers, bathroom passes, shower access, and high-topped therapeutic boots is made by a physician employed by Centurion. FDC then adheres to providing the supplies as ordered by those physicians.** |

BASIS TO COMPEL: Again, the above is based on a misquote of the First

Amended Complaint (ECF 25, ¶ 42), as saying that the transfer to Suwannee C.I.

"forms" the basis for this new action. "Forms" is a verb that applies to a singular

subject. But Plaintiff actually stated that "the discrimination and violations followed

Plaintiff upon his transfer to Suwannee C.I., which *form* the basis for this new

action." The verb "form" reflects a plural subject and clearly references "the

discrimination and violations" that followed Plaintiff to Suwannee C.I. The language

does not suggest they began there. The history of Plaintiff's impairment is relevant

to the allegations in this case – not just the history beginning at his transfer.

**RESPONSE:** Defendant Dixon refers Plaintiff to his detailed response to

33

Interrogatory No. 2 in Plaintiff's 3rd Set of Discovery Responses. The basis for compelling a better answer here is no better than the first and second time it has been raised. Plaintiff dismissed all claims for his previous "impairment history" when he signed the settlement agreement in February 2022. That fact is incontrovertible and Defendant will not address it further.

| Interrogatory | Response |
|---|---|
| 5. Please describe in detail each noted No. 2 in Plaintiff's 3rd occurrence or recurrence of cellulitis symptoms that Plaintiff has experienced since 2018, giving the date the occurrence or recurrence was noted, the treatment that was ordered, and how the treatment was carried out, the identity of persons who treated Plaintiff for the condition, and the date that the cellulitis was deemed to be under control. | **Response: Objection as to relevance of time periods outside of the current litigation as Plaintiff's Amended Complaint focuses on the time since his October 15, 2020, transfer to Suwannee C.I., which he states "form[s] the basis for this new action." Doc. 25, ¶ 41. Notwithstanding the objection, all of the requested information can be found in Plaintiffs medical file.** |

BASIS TO COMPEL: Again, the above is a misquote. Defendant quotes the First Amended Complaint (ECF 25, ¶ 42), as saying that the transfer to Suwannee C.I. "forms" the basis for this new action. "Forms" is a verb that applies to a singular subject. But Plaintiff actually stated that "the discrimination and violations followed Plaintiff upon his transfer to Suwannee C.I., which form the basis for this new action." The verb "form" reflects a plural subject and clearly references "the discrimination and violations" that followed Plaintiff to Suwannee C.I. The language does not suggest they began there. The history of Plaintiff's impairment is relevant

to the allegations in this case – not just the history beginning at his transfer.

As to the records that "can be found in Plaintiff's medical file," a producing party cannot simply refer to a large body of records and say that the responsive records are somewhere in the stack. *Velez v. Bank of Am.*, No. 8:18-cv-88-T-35SPF, at *7 (M.D. Fla. Oct. 4, 2019) ("If Plaintiffs have already produced the documents, they must specifically identify which documents are responsive to the request and where they are located in the folders provided.").

**RESPONSE:** Defendant Dixon has thoroughly responded, by now *ad nauseam*, to these same two bases for compelling responses and will do so no longer.

## CONCLUSION

Based on these arguments and exhibits, Defendant Dixon respectfully requests this Court to deny Plaintiffs' Motion to Compel Document Production and Better Answers and the awarding of any attorney's fees.

Respectfully submitted,

*/s/ Thomas Buchan*
Thomas Buchan, Esq.
Florida Bar No. 1010923
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
Phone: (850) 877-7776
Email: tom@jsh-pa.com
*Attorney for Defendants*

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served

on all counsel of record by CM/CEF on January 5, 2024.

*/s/ Thomas Buchan*
Thomas Buchan
