## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**DONNY PHILLIPS,**

      **Plaintiff,**

**v.**                              **Case No. 3:22-cv-997-BJD-LLL**

**RICKY DIXON, in his Official Capacity as
Secretary of the Florida Department of
Corrections, CENTURION OF FLORIDA,
LLC, MHM HEALTH PROFESSIONALS,
LLC, ALEXIS FIGUEROA, M.D.,
ELIZABETH HOLMES, BRITTNEY
CANNON, CONNIE LYNN ADAMS, SGT.
SAVONIA RICHARDSON-GRAHAM, SGT.
DEBRA ALDRIDGE, and OFCR TERESSA
FILLMORE HAWTHORNE**

      **Defendants,**

_____/

## DEFENDANT ALDRIDGE'S MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

Defendant Debra Aldridge, by and through undersigned counsel and pursuant to Rule 56, Federal Rules of Civil Procedure, hereby moves for summary judgment and states the following in support thereof:

### I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff has been forced to reduce his amended complaint to a small collection of unsupported allegations against Defendant Dixon in his official capacity and three FDC employees at Suwannee Correctional Institution Annex. Specifically, Plaintiff presents these allegations in his Amended Complaint [Doc. 25] in a muddled attempt

1

to conflate and commingle his medical and ADA issues and lay as many of them as possible at the feet of two correctional officer sergeants and one correctional officer, in addition to the secretary of the Florida Department of Corrections. He has been forced to attempt this legal legerdemain because co-defendants Centurion, MHM, and the individual medical defendants filed motions to dismiss on January 31, 2022 [Docs. 51-54, 59], and Plaintiff responded by immediately filing a Notice of Voluntary Dismissal the next day on February 1, 2022 [Doc. 60], to include not only Centurion and HM but also each of the individual medical defendants.

Thus, the three FDC defendants remain with the FDC secretary under Plaintiff's flawed and generally hyperbolic theory of his case for Eighth Amendment violations of interference with medical treatment; conspiracy to violate the Eighth Amendment; and for abuse or neglect of a vulnerable adult.

Importantly, Plaintiff settled his previous lawsuit (Case No. 4:18-cv-139-AW-MJF in the Northern District of Florida Tallahassee Division), on February 16, 2022, more than 19 months after he transferred to Suwannee CI Annex. *Ex. 1, Settlement Agreement*. He filed this current suit on September 15, 2022, raising the precise issues—First Amendment retaliation, ADA violations, various Eighth Amendment violations, deliberate indifference, failure to treat, etc.—with the same classifications of characters—doctors, nurses, correctional officers, the department's secretary for injunctive relief purposes—as he did in 2018, and as he plans to do again. *Ex. 2, Plaintiff's Deposition, 123:8 – 124:10*. Defendants discuss this litigation history in detail below.

2

## II.    STATEMENT OF FACTS

### A. Plaintiff's Extensive Litigation History

Plaintiff has spent considerable time in federal court since 2015, suing the Florida Department of Corrections ("FDC") and its employees and contractors repeatedly at every institution in which FDC placed him. *See Phillips v. Pittman*, No. 1:15-cv-110 (N.D. Fla.) ("2015 case"); *Phillips v. Jones, et al.*, No. 4:18-cv-139 (N.D. Fla) ("2018 case"), and now *Phillips v. Dixon, et al.,* No. 3:22-cv-997 (M.D. Fla.) ("2022 case").

In the 2015 case, Plaintiff alleged FDC security staff at Mayo Correctional Institution violated his First Amendment rights when they harassed, insulted, and punished him for filing inmate grievances and a lawsuit. [2015 case, Doc 30, ¶¶ 31-41]. He claimed those same officers violated his Eighth Amendment rights because they refused him timely access to toilet facilities and deprived him of an adequate supply of adult diapers and other medical supplies. *Id.* at ¶¶ 43-45, 53. However, the Court granted the FDC officers' motion to dismiss the Eighth Amendment claim with prejudice and granted the motion to dismiss the First Amendment claim without prejudice. [*Id.*, Doc. 44 at 24]. However, the Court soon dismissed all counts with prejudice in November 2017 as a result of the parties' joint stipulation to do so. [*Id.,* Doc. 54]. This cleared the way for Plaintiff's second lawsuit.

Plaintiff filed his next case in March 2018 while he was incarcerated at Northwest Florida Reception Center. The allegations against FDC did not change:

First and Eighth Amendment violations, plus violations of his Americans with Disability Act and Rehabilitation Act rights. [2018 case, Doc. 311 (Third Am. Compl.) *Id*. at 29-30. The specific allegations reprised those of the 2015 case: inadequate diapers, wipes, soap, and ointments; security staff interfering with Plaintiff's hygiene supplies and teasing him about them, I*d*. at ¶ 242(a)-(i); retaliating against him for filing inmate grievances by preventing willing inmates from assisting him, and denying him an ADA-compliant cell. This suit was settled when Plaintiff received a monetary award of $25,000 from FDC and signed a settlement agreement and release of all claims on February 16, 2022. *Ex. 1,* Settlement Agreement. This settlement agreement is significant because this instant lawsuit is a direct breach of these settlement terms.

### B. 2018 Case Settlement Agreement Executed in 2022

In this Settlement Agreement, Plaintiff:

> forever releases, acquits, and discharges … the State of Florida, the Florida Department of Corrections, and their agents, contractors, servants, employees, former employees, and successors of and from any and all claims, actions, causes of actions, demands, rights, damages … which [Plaintiff] **now has or which may hereafter accrue on account of or in any way growing out of the events and injuries that were at issue in this action,** including any and all known and unknown, foreseen and unforeseen bodily and personal injuries.
> *Id (emphasis added).*

In the instant suit, Defendants have held that Plaintiff's allegations arise from the moment he arrived at Suwannee Correctional Institution Annex on October 15, 2020, as Plaintiff readily acknowledges and admits this. [Doc. 25,  ¶¶ 41-42]; *Ex. 2, Plaintiff's Deposition, 13:21-24.* However, the language of the settlement agreement states

4

that any claim made before the date of the settlement agreement (February 16, 2022) to be null and void. It also bars claims made *after* the settlement agreement "growing out of the same events and injuries that were at issue in this action." *Ex. 1, Settlement Agreement.* In his effort to have his litigation both ways in clear violation of the Settlement Agreement, Plaintiff stated in this instant case that "the discrimination and violations followed Plaintiff [from Northwest Florida Reception Center] upon his transfer to Suwannee C.I., which form the basis for this new action." [Doc. 25, ¶ 41].

Finally, Plaintiff signed a settlement agreement and release of all claims with Centurion on February 9, 2022, accepting $20,000 in settlement. The language of this document is virtually identical in all relevant parts to the one Plaintiff signed with FDC. *Ex. 3, Centurion Settlement.* After Plaintiff filed suit in September 2022, the Centurion medical defendants filed their motions to dismiss on January 31, 2023. [Docs. 51-54, 59] Plaintiff filed a Notice of Voluntary Dismissal [Doc. 60] on February 1, 2023. Clearly Centurion's arguments regarding breaching the terms of the settlement agreement by filing an identical suit gave Plaintiff significant pause. Despite that dismissal, Plaintiff continues forward with a fatally diminished collection of arguments to support the allegations with which the Defendants are all too familiar.

### C. Plaintiff's Incarceration at Suwannee C.I. Annex

Plaintiff paints his arrival at Swannee C.I. Annex on October 15, 2020, in dramatic though inaccurate terms: someone stole his "therapeutic boots" almost before he exited the transport van; another someone confiscated his hygiene supplies and later refused to replace them; and a group of officers summarily marched him off

to confinement. [Doc. 25, ¶¶ 46, 52-53]. It is standard procedure to confiscate any and all medical supplies of any kind from inmates transferred to an until they are medically evaluated. It is also standard procedure to place newly transferred inmates in administrative confinement until a classification officer reviews his documents and assigns him to an appropriate dorm or cell based upon his status. Plaintiff has conflated and comingled Suwannee C.I. Annex medical staff and security staff together and claims they have concocted a conspiracy to deny him his medical supplies, prevent him from receiving necessary medical care, and refused to give him access to any reasonable accommodations, all in retaliation against him because he complains about these acts, writes frequent inmate grievances, and files lawsuits.

Because of his February 1, 2023, voluntary dismissal, Plaintiff may no longer direct his allegations toward any "medical defendants" and any comments and allegations involving them should essentially be stricken as they are entirely irrelevant to the Corrections Defendants. Instead, Plaintiff is limited to Secretary Dixon, Sergeants Richardson and Aldridge, and Officer Hawthorne.

Plaintiff alleges that Defendant Aldridge retaliated against him when she announced he was an "undercover federal agent" in front of other inmates, [Doc. 25, ¶ 90], joined with Defendant Richardson in imposing group punishment on other inmates in his dorm as a result of his actions [Doc. 25, ¶ 94], seized his legal journal and photographed certain pages [Doc. 25, ¶ 71], prevented him from accessing his medical supplies [Doc. 25, ¶152], and prohibited him from accessing shower facilities. [Doc. 25, ¶ 89].

Contrary to his own Amended Complaint, Plaintiff changed his version of the "undercover federal agent" allegation in his sworn deposition testimony. Here, he claimed that no inmates heard this alleged statement because Defendant Aldridge did not make it in the dorm but instead summoned him to her office and spoke with him there. *Ex. 2, Plaintiff's Deposition, 192:24 – 194:7*. Plaintiff alleged the subsequent threats he received from other inmates arose from his being seen speaking with Defendant Aldridge in her office rather than from any alleged "public announcement" regarding his status as an undercover federal agent. *Id*. Defendant Aldridge does not have an "office;" she and other security staff have what is called an officers' station in the dorm, which also serves as the control room. This area is very secure, and also glassed in, so everything in the dorm is visible to officers inside and visible to inmates outside in the dorm. Further, Plaintiff could not provide the identity of any inmate allegedly threatening him as a result of his "conversation" with Defendant Aldridge, other than a vague reference to "different gang members," to include the always useful "Bloods." He did admit, however, that no one, inmates or staff, took any action against him or acted on any alleged threat. *Ex. 2, Plaintiff Deposition, 192:14 – 194:7*.

In conjunction with Plaintiff's on-again-off-again tale of federal agents, he stated in his deposition that he hoped there were indeed undercover federal agents at Suwannee C.I. Annex because of "[s]o many deaths, so much going on... so many violations....It's a dangerous place." *Ex. 2, Plaintiff's Deposition, 74:4-11*. The mortality statistics for Suwannee C.I. Annex from 2017 through 2023 show two homicide deaths

and two deaths as yet unclassified out of a total of 58 deaths. *Ex. 4, Inmate Mortality Stats.*

Plaintiff's characterization of Suwannee C.I. Annex as a dangerous place segued into his opinion that at some unspecified time Defendant Aldridge might have been about to be arrested. Again, and without a scintilla of evidence, Plaintiff launched into an improbable diatribe: "Yes. I -- actually openly making statements that she's killed inmates where she was taught and that's where she was trained at Lake Butler [Reception and Medical Center] and she's killed multiple inmates there and she won't hesitate to do it again at Suwannee…but, yes." *Ex. 2, Plaintiff's Deposition, 76:12-18.* When Plaintiff was asked if he had directly heard Defendant Aldridge make these statements, he said: "Yes. She makes them statements openly in the dorm and lets the inmates know." *Ex. 2, Plaintiff's Deposition 76:23-25.*

Of course, no reasonably cognizant individual would believe that a correctional officer would be trained to kill inmates and then brag publicly about doing so. The degree of disbelief cannot be suspended enough to encompass such arrant nonsense. If nothing else, Plaintiff's claims here, and similar ones he makes elsewhere, eliminate any vestige of credibility remaining with regard to the allegations in his Amended Complaint.

Plaintiff's deposition testimony characterized Defendant Aldridge's alleged actions against him as having "access to block my access to go get my medical supplies. Access to showers and to hold me in unsanitary conditions or to put me in confinement if I choose to go to the bathroom during long periods of recounts." *Ex. 2, Plaintiff's*

8

*Deposition, 30:23 – 31:4.* When he was asked if Defendant Aldridge ever put him in confinement, Plaintiff responded that she never did. *Id. 31:5-7.* Alleging that a defendant has the capability [not the "access"] to take specific actions does not equate to a defendant actually taking those specific actions. And Plaintiff had to admit that Defendant Aldridge did not take those actions or, in the alternative, did not offer a scintilla of corroborating evidence that she did so.

Plaintiff claims that Defendant Aldridge's actions against him constituted retaliation because he filed grievances in general and grievances against her specifically. Because Plaintiff chose not to depose Defendant Aldridge, his allegations in the Amended Complaint and his deposition testimony remain the only support of these so-called retaliatory actions. However, Plaintiff has already walked back his original characterization of the federal agent issue to the point it became a one-on-one conversation between him and Defendant Aldridge in the officers' station with absolutely no identifiable threats as a result and no harm whatever to him. The allegation regarding group punishments was discounted by Defendant Richardson in her deposition because Plaintiff claimed she was an equal participant in this rather incoherent claim, and Plaintiff himself made it even less credible with his tales of Friday night beatings.

## MEMORANDUM OF LAW

### III.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when the moving party shows that "…there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); *Fed. R. Civ. P. 56(c)*. An otherwise correctly supported motion for summary judgment cannot be defeated simply due to the existence of some factual disputes between the parties. The precise requirement is that there be "no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Tipton v. Bergrohr GMBH—Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A party asserting that a fact is genuinely disputed must support the assertion by citing to specific materials in the record because failure to do so allows the court to consider the facts as undisputed for summary judgment purposes. Fed. R. Civ. P. 56(c)(1)(A), (e)(2)).

The Court is not obligated, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50. "A mere 'scintilla' of evidence

supporting the [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990) (quoting *Anderson*, 477 U.S. at 242). "[C]onclusory allegations without specific supporting facts have no probative value," and are legally insufficient to defeat summary judgment. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and a court should grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.   ARGUMENT

### A. Plaintiff is prohibited from bringing this lawsuit by the plain language of the 2018 Case's Settlement Agreement he entered into.

When parties stipulate to a dismissal with prejudice based upon a settlement agreement, the principles of *res judicata* apply," albeit in "a somewhat modified form." *Norfolk Southern Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004); *Real v. Goodell*, 2019 WL 2211111, at *4 (M.D. Fla. May 22, 2019) ("A plaintiff's complaint is subject to dismissal where it asserts claims precluded by a settlement agreement.") Thus, "[d]ismissal [is] not determined by the claims specified in the original complaint, but instead by the terms of the Settlement Agreement." *Norfolk*, 371 F.3d at 1289. Accordingly, courts should "attempt to effectuate the parties' intent," which requires courts to "look[] to the Settlement Agreement to determine what claims it precluded from future litigation." *Id.* at 1290. In doing so, the court

11

must "construe [the] settlement agreement [by] applying Florida contract law." *Sherrod v. Sch. Bd. of Palm Beach Cty.*, 550 F. App'x 809 (11th Cir. 2013); *Norfolk*, 371 F.3d at 1290 (explaining that in cases of dismissal pursuant to a settlement agreement *res judicata* determinations are governed by "traditional rules of contract interpretation"). As this Court knows, the plain meaning of the Settlement Agreement controls the Court's "four corners" analysis.[1]

### 1. The intentions of both parties are clear.

Defendants[2] made their intentions patently obvious in the Settlement Agreement by declaring they "intend merely to avoid litigation and buy their peace" with a payment of $25,000.00 to Plaintiff. *Ex. 1, Settlement Agreement*. In exchange, Plaintiff released Defendants from "any and all claims, actions, causes of actions, demands, rights, damages, costs, loss of service, expenses and compensation, whatsoever, including attorney's fees, **which the (Plaintiff) now has or which may hereafter accrue** on account of or in any way growing out of the events and injuries that were at issue in this action ..." *Id*. (emphasis added). Based on the plain language of the Settlement Agreement, Plaintiff's intent was to secure a monetary sum and FDC

---

[1] "Where the plain meaning of an agreement is clear, we may not go beyond the four corners of the document ...." *Norfolk*, 371 F.3d at 1290; *see also Sherrod*, 550 F. App'x at 812 ("Under Florida law, '[w]ords in a contract are to be given their plain and ordinary meaning, and it is not for the court to add or subtract any language from the face of a clearly worded agreement.'") (citation omitted).

[2] All Defendants in this lawsuit are covered by that Settlement Agreement as it released in pertinent part, "the State of Florida, the Florida Department of Corrections, and their agents, contractors, servants, employees, former employees, and successors..." *Ex. 1, Settlement Agreement*.

remitted $25,000.00 to Plaintiff via his counsel, James Cook, thereby satisfying FDC's obligations.

## 2. The terms of the Settlement Agreement are complete.

Plaintiff, who was represented by Mr. Cook when he signed the Settlement Agreement on February 16, 2022, not only agreed to releasing the Defendants from all existing claims and causes of action at the time of its execution, but he also agreed that the three-page document contained the entirety of the terms of the agreement between the parties. *Ex. 1, Settlement Agreement*. This is central to the issue at hand because there is not a single mention of any accommodations related to Plaintiff's disability and or condition including, but certainly not limited to, provisions of wipes or ointments/creams, the quantity or type of diapers Plaintiff will receive, bathroom and shower passes or therapeutic boots.

Certain allegations in the Amended Complaint that occurred at Suwannee C.I. Annex precede Plaintiff's signing the Settlement Agreement. These are:

The March 9, 2021, allegation against Defendant Aldridge and Plaintiff's "legal journal;" [Doc. 25, ¶ 71]

The May 7, 2021, allegation that Defendant Richardson refuse to charge Plaintiff' tablet; [Doc. 25, ¶ 74].

The May 9, 2021, allegation that Defendant Hawthorne refused to allow Plaintiff to shower before 5:00 p.m. [Doc. 25, ¶ 75].

The sole allegation occurring after February 16, 2022, concerns an alleged threat on May 13, 2022, from inmate Carl Johnson to Plaintiff that he should stop writing

13

grievances about Defendants Richardson and Aldridge. [Doc. 25, ¶ 95]. Plaintiff provided no further details, including the specific nature of the threat, or whether inmate Johnson ever pursued his threat.

Plaintiff does not provide any dates or number of occurrences for his remaining generic and conclusory allegations regarding medical supplies, medical treatment, denial of passes, etc., but in light of how quickly he began filing grievances after his transfer to Suwannee C.I. Annex, it is safe to say that these would also fall within days of his transfer and months before he signed the settlement agreement.

Based on the foregoing, every allegation Plaintiff has raised against the four Defendants in the instant case is prohibited by the Settlement Agreement, thus making summary judgment required.

**B. Plaintiff has failed to meet the required elements of his First Amendment Retaliation claim.**

"To prove a First Amendment retaliation claim, an inmate must show that (1) his speech was constitutionally protected, (2) he suffered an adverse action that would likely deter a person of ordinary firmness from engaging in such speech, and (3) a causal relationship between the retaliatory action and the protected speech existed." *Lopez v. United States*, 656 Fed. Appx. 957, 964 (11th Cir. 2016) (citing *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008)).

As to the third element, "[o]nce the plaintiff establishes that the protected conduct was a motivating factor behind the harm, the burden of production shifts to the defendant. The defendant can prevail on summary judgment if it can show it would

14

have taken the same action in the absence of the protected activity." *Jacoby v. Mack*, 755 Fed.Appx. 888, 902 (11th Cir. 2018) (citing *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013)).

"An official-capacity suit is, 'in all respects other than name, to be treated as a suit against the entity [of which the defendant is an agent].'" *Fischer v. Ellegood*, 238 Fed.Appx. 428, 431 (11th Cir. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (alteration in original). "To prevail under § 1983 against that entity, a plaintiff must show that the entity itself was the 'moving force' behind this constitutional deprivation, and the only way to do that is by identifying a 'policy or custom' [of the entity that] played a part in the violation of federal law.'" *Id.* (alteration in original).

Plaintiff has failed to plead facts supporting a claim of First Amendment Retaliation against Defendant Aldridge or any support that she did not act in her official capacity. Again, Plaintiff has suffered no restrictions of his constitutional right to free speech that encompasses his right to file grievances against FDC and communicate with family members.

Plaintiff alleges that on March 9, 2021, Defendant Aldridge intercepted Plaintiffs legal pad and proceeded to take pictures of the legal pad with other correctional officers and further question Plaintiff about the legal pad entries, [Doc. 25, ¶ 71]. This clearly has not deterred Plaintiff from filing further grievances and continuing litigation. Plaintiff further alleges Defendant Aldridge allowed other inmates to have the run of the showers during the day while making ADA inmates like Plaintiff wait until after 5 PM. [Doc. 25 ,¶ 89]. Plaintiff admits in his deposition

15

that this was standard policy at FDC, and that all ADA inmates were subjected to these procedures. *Ex. 2, Plaintiff's Deposition, 32:23 – 33:13.* As for Plaintiff's allegations that Defendant Aldridge refused him any medical treatment or supplies, Plaintiff has completely contradicted that in his deposition:

> Q: Okay. Did Sargeant Aldridge ever block you or prohibit you from communicating with the medical staff when they made their daily rounds in confinement?
> A: Not that I recall.
> *Ex. 2, Plaintiff's Deposition, 56:5-8.*
>
> Q: Did any of – did Richardson, Aldridge, or Hawthorne ever prevent you from going to medical to pick up the new passes?
> A: No, not these new passes.
> *Ex. 2, Plaintiff's Deposition, 101:25 – 102:3.*

As is the case with Defendant Richardson, Plaintiff has not suffered any 'harm' due to any of the allegations of retaliation against Defendant Aldridge to begin with. *Fischer v. Ellegood*, 238 Fed.Appx. 428, 431 (11th Cir. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (alteration in original). He was never assaulted by the inmate that allegedly threatened him, who was also wheelchair bound.

For these reasons, Plaintiff has failed to plead facts supporting a claim of First Amendment Retaliation against Defendant Aldridge. Plainly, Plaintiff has not suffered any harm because of any act or omission by Defendants Aldridge, Hawthorne, or Richardson; he has not been assaulted by an inmate, and he has been afforded every right to seek medical treatment, receive medical supplies, file formal grievances against FDC, and communicate with his family. Summary judgment is therefore necessary.

16

**C. Plaintiff has failed to meet the legal elements of his Deliberate Indifference (Interference with Treatment) claim.**

"[W]hen a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1999). To prevail on a deliberate indifference claim, a Plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). "A medical need is serious when it 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King v. Henry*, No. 5:09cv365/MCR/EMT, 2011 U.S. Dist. LEXIS 135579 at *33 (N.D. Fla. Sep. 19, 2011) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

To establish deliberate indifference, a Plaintiff must prove, "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (alteration in original). "The defendants must have been 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]' and then actually draw that inference." *Easley v. Dep't of Corr.*, 590 F. Appx 860, 868 (11th Cir. 2014) (quoting *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003)). "Deliberate indifference may be evidenced by the intentional interference of a prison official with medical treatment once it is prescribed." *King v. Henry*, No.

5:09cv365/MCR/EMT, 2011 U.S. Dist. LEXIS 135579 at *33 (N.D. Fla. Sep. 19, 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976)).

Plaintiff has failed to plead facts sufficient to support a claim of Deliberate Indifference against Defendant Aldridge. For Plaintiff to succeed on his claim of Deliberate Indifference, Plaintiff must allege facts sufficient to support the claim that (1) Plaintiff had a serious medical need, (2) Defendant Aldridge was deliberately indifferent to that need, and (3) that causation existed between this deliberate indifference and Plaintiff's injury. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

Plaintiff alleges in his Amended Complaint that (1) Defendant Aldridge refused to permit Plaintiff to receive care and medical supplies to treat or mitigate his serious medical condition to avoid the risk of serious harm [Doc. 25, ¶ 152] and (2) that Defendant Aldridge alleged repeated threats against Plaintiff and suggestions to other inmates have materially contributed to his health risks. [Doc. 25, ¶ 153]. Specifically, Plaintiff alleges that (1) on March 9, 2021, Defendant Aldridge intercepted Plaintiffs legal pad and proceeded to take pictures of the legal pad with other correctional officers and further question Plaintiff about the legal pad entries, [Doc. 25, ¶ 71]. (2) that Defendant Aldridge allowed other inmates to have the run of the showers before 5 p.m., [Doc. 25 ,¶ 89]. (3) that Defendant Aldridge told other inmates in Plaintiff's presence that Plaintiff was an undercover agent, [Doc. 25, ¶ 90]. (4) and that Defendant Aldridge subjected inmates in Plaintiff's dorm to group punishment and blamed it on Plaintiff. [Doc. 25, ¶ 94].

Plaintiff has not proven that Defendant Aldridge had subjective knowledge of a serious risk or harm to Plaintiff. Defendant Aldridge is not medically certified, and without explicit notice of Plaintiff's condition, would not have knowledge of Plaintiff's medical need. Plaintiff mentions in his Amended Complaint that "Plaintiff had symptoms of severe cellulitis with extreme swelling and open bleeding sores" [Doc. 25, ¶ 70]. However, Plaintiff does not give evidence that he put Defendant Aldridge, or any other Defendant for that matter, on notice of this harm.

Even if Defendant Aldridge had subjective knowledge of Plaintiff's medical need, she certainly did not disregard them. Plaintiff admits throughout his deposition that he has not been blocked from receiving any medical treatment or medical supplies. When questioned about this allegation in his deposition, Plaintiff admitted that it was standard FDC procedure that no inmates, other than those who had specific and privileged duties, were allowed to be in the showers before 5 p.m. Plaintiff admitted that he currently does not have a working assignment in the prison that would allow him access to the showers before 5 p.m., so Defendant Aldridge was simply following FDC procedures by not allowing Plaintiff access to the showers until after 5 p.m. *Ex. 2, Plaintiff's Deposition, 32:23 – 33:13.* Plaintiff further completely contradicts his allegations that Defendant Aldridge refused him access to medical treatment and supplies:

> Q: Okay. Did Sargeant Aldridge ever block you or prohibit you from communicating with the medical staff when they made their daily rounds in confinement?
> A: Not that I recall.
> *Ex. 2, Phillips Deposition, 56:5-8.*

Q: Did any of – did Richardson, Aldridge, or Hawthorne ever prevent
you from going to medical to pick up the new passes?
A: No, not these new passes.
*Ex. 2, Phillips Deposition, 101:25 – 102:3.*

Given Plaintiff's clear contradiction of his allegations against Defendant
Aldridge in his deposition and the lack of factual pleading to support subjective
knowledge, Plaintiff's claim of Deliberate Indifference against Defendant Aldridge is
without merit.

### D. Plaintiff has failed to meet the legal requirements of his Conspiracy claim, which also must be denied based on the intracorporate conspiracy doctrine.

A plaintiff may state a § 1983 claim for conspiracy to violate constitutional
rights by showing a conspiracy existed that resulted in the actual denial of some
underlying constitutional right. *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359,
1370 (11th Cir. 1998). "A plaintiff claiming a § 1983 conspiracy must prove the
defendants reached an understanding to violate the plaintiff's constitutional rights."
*Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010). "[T]he linchpin for
conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cty.
Comm'rs of Alachua Cty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992). While a plaintiff
may not rely on conclusory allegations to state a claim for relief, *Ashcroft v. Iqbal*, 556
U.S. 662, 680 (2009), facts supporting a conspiracy may be circumstantial. *Burrell v.
Bd. of Trs. of Ga. Military Coll.*, 970 F.2d 785, 789 (11th Cir. 1992)). "To state a claim
for civil conspiracy under Florida law, a plaintiff must allege (1) an agreement between
two or more parties (2) to do an unlawful act by unlawful means (3) the committing

of an overt act in pursuance of the conspiracy and (4) damage to the plaintiff as a result of the act." *Walton v. Fla. Dep't of Corr.*, 2019 U.S. Dist. LEXIS 81007, at *23 (M.D. Fla. May 14, 2019) (applying elements of Conspiracy under Florida common law to the § 1983 context).

Plaintiff has failed to plead sufficient facts in support of a claim of conspiracy under § 1983 against Defendant Aldridge. Plaintiff alleges in his Complaint that Defendant Aldridge created circumstances that increased the risk of serious harm to the Plaintiff, "including denial of access to bathroom and shower, and also denying care to remedy the risk of harm, such as sufficient adult diapers, sanitation needs, and an impaired inmate assistant." [Doc. 25, ¶ 156]. Plaintiff not only fails to provide evidentiary support of these allegations against Defendant Aldridge, but also has contradicted these allegations in his deposition.

As a threshold issue, Plaintiff must allege that there has been an agreement between Defendant Aldridge and some other party to deny Plaintiff medical treatment. *Walton v. Fla. Dep't of Corr.*, 2019 U.S. Dist. LEXIS 81007, at *23 (M.D. Fla. May 14, 2019) (applying elements of Conspiracy under Florida common law to the § 1983 context). Both Plaintiff's Amended Complaint and deposition are without any example or allegation of Defendant Aldridge having communicated with anyone aside from Plaintiff himself about his medical treatment.

Plaintiff made the following assertions regarding his medical treatment in relation to Defendant Aldridge in his deposition: When asked about whether Defendant Aldridge had access to Plaintiff's medical supplies, Plaintiff admits that

Defendant Aldridge only had access to block Plaintiff from going to showers by putting him in confinement. He admits that she never put him in confinement, and further, that she would regularly put the shower curtain up for Plaintiff so that he could shower privately. *Ex. 2, Plaintiff's Deposition, 31:5 – 32:7.* When asked if Defendant Aldridge had ever refused Plaintiff medical attention, Plaintiff admitted that Defendant Aldridge had never denied him access to emergency medical attention and went so far as to encourage him to seek medical attention for his leg. *Ex. 2, Plaintiff's Deposition, 64:1-13.*

Given the absence any factual allegation of Defendant Aldridge coming to an agreement between herself and another party as required by *Walton* and Plaintiff's contradictory statements admitting to receiving adequate medical attention from Defendant Aldridge, Plaintiff has failed to plead sufficient facts to support a claim of conspiracy against Defendant Aldridge.

Furthermore, Plaintiff's conspiracy claim fails due to the intracorporate conspiracy doctrine. "The doctrine recognizes that '[a] corporation cannot conspire with its employees and its employees, while acting within the scope of their employment, cannot conspire among themselves.'" *Moss v. Dixon*, 2023 U.S. Dist. LEXIS 92809 at *24 (M.D. Fla. May 26, 2023) (quoting *McPhie v. Yeager*, 819 F. App'x 696, 701 (11th Cir. 2020)). It is not possible for a single legal entity to conspire with itself. *Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000). *See Nassar v. Fla. Dep't of Agtic.*, 754 Fed. App'x 903, 907 (11th Cir. 2018).

22

**E. Plaintiff is barred from bringing his Abuse or Neglect of a Vulnerable Adult claim against corrections officials.**

"The Florida legislature enacted the Adult Protective Services Act to protect 'vulnerable adult' from 'abuse, neglect, and exploitation' by 'caregivers.'" *Bobbin v. Corizon Health, Inc.*, 2014 U.S. Dist. LEXIS 154289 at *11-12 (M.D. Fla. Oct. 29, 2014) (citing *Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*, 983 So.2d 717, 718 (Fla. 1st DCA 2008)). "To state a cause of action under section 415.1111, a complaint must set forth factual allegations which demonstrate that the plaintiff or the plaintiff's decedent was a 'vulnerable adult' as defined by section 415.102(28), that the defendant was a 'caregiver' as defined by section 415.102(4), and that the defendant committed 'abuse' as defined by section 415.102(1), or 'neglect' as defined by section 415.102(15), or 'exploitation' as defined by section 415.102(7) with respect to the vulnerable adult." *Bohannon v. Shands Teaching Hosp. & Clinic, Inc.*, 983 So.2d 717, 721 (Fla. 1st DCA 2008).

"'Vulnerable adult' means a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging." Fla. Stat. § 415.102(28). "'Neglect' means the failure or omission on the part of the caregiver or vulnerable adult to provide the care, supervision, and services necessary to maintain the physical and mental health of the vulnerable adult, including, but not limited to, food, clothing, medicine, shelter, supervision, and medical services, which

23

a prudent person would consider essential for the well-being of a vulnerable adult." Fla. Stat. § 415.102(16). "Abuse is defined as any willful act or threatened act by a relative, caregiver, or household member which causes or is likely to cause significant impairment to a vulnerable adult's physical, mental, or emotional health. Fla. Stat. § 415.102(1). "To state a cause of action under section 415.1111, a complaint must set forth factual allegations which demonstrate that the plaintiff or the plaintiff's decedent was a 'vulnerable adult' as defined by section 415.102(27), that the defendant was a 'caregiver' as defined by section 415.102(4), and that the defendant committed 'abuse' as defined by section 415.102(1), or 'neglect' as defined by section 415.102(15)...."

"Thus, a plaintiff alleging 'abuse' [or neglect] must establish the defendant is a … caregiver…. *Grasso v. Grasso*, 131 F.Supp. 3d 1303, 1313 (M.D. Fla. 2015) (internal quotations omitted); *See also Bohannon v. Shands Teaching Hosp. & Clinics, Inc.*, 983 So.2d 717 (Fla. 1st DCA 2008). "'Caregiver' means a person who has been entrusted with or has assumed the responsibility for frequent and regular care of or services to a vulnerable adult on a temporary or permanent basis and who has a commitment, agreement, or understanding with that person or that person's guardian that a caregiver role exists. 'Caregiver' includes, but is not limited to, relatives, household members, guardians, neighbors, and employees and volunteers of facilities as defined in subsection (9). Section 415.102(5), Florida Statutes.

For the purpose of departmental investigative jurisdiction, the term **"caregiver" does not include law enforcement officers or employees of municipal or county detention facilities or the Department of Corrections while acting in an official**

**capacity**." Fla. Stat., § 415.102(5) (emphasis added). Further, allegations concerning alleged inaction of non-medical jail staff do not amount to 'neglect' as defined in § 415.102(16). *Lamego v. Mascara*, 2021WL 561655 (S.D. Fla. Jan. 7, 2021).

## V.    CONCLUSION

Plaintiff continues his repetitive series of lawsuits based around the same class of violations, the same category of players, and admits to having more lawsuits in the works despite previously settling his claims, including past, present, and future claims which may arise. He either cannot proceed on these recycled claims or has failed to meet the requisite elements detailed above.

Wherefore, Defendant Aldridge respectfully requests this Court enter final summary judgment and grant such other relief as the Court deems proper.

Respectfully submitted,

*/s/ Thomas Buchan*
Thomas Buchan
Florida Bar No. 1010923
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
Telephone: (850) 877-7776
Tom@jsh-pa.com
*Attorneys for Corrections Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record by CM/ECF on February 5, 2024.

*/s/ Thomas Buchan*
Thomas Buchan