**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DONNY PHILLIPS,

      Plaintiff,

vs.

RICKY DIXON., et al.,

      Defendants.

Case No. 3:22-cv-997-BJD-LLL

**PLAINTIFF'S RULE 26(a)(2) DISCLOSURES**

      COMES NOW the Plaintiff, DONNY PHILLIPS, by and through undersigned counsel, hereby files this Rule 26(a)(2) disclosure, as follows:

(i)     *A complete statement of all opinions the witness will express and the basis and reasons for them*: Attached please find the report prepared by Dr. Homer Venters.

(ii)    *The facts or data considered in forming opinion*: Attached hereto please find the report prepared by Dr. Homer Venters.

(iii)   *Any exhibits that will be used to summarize or support opinions*: None.

(iv)   *The witness's qualifications, including a list of all publications authored in the previous ten years*: Please see the CV of expert attached hereto.

(v)    *A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or deposition*: See testimony list attached hereto.

(vi)   *Compensation to be paid for the study in the case*. $500 per hour.


I CERTIFY a true copy hereof was sent by Electronic Mail on 7/28/23 to:

Thomas Buchan, Esq., Howell, Buchan, and Strong, tom@jsh-pa.com

*s/James V. Cook, Esq.*
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

Expert report of Dr. Homer Venters

Review of Care for Mr. Donny Phillips in the Florida Department of Corrections

## A.  Background and Qualifications

I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people. My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009). My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security. This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews, as well as all training and oversight of physicians, nursing, and pharmacy staff. In these

Expert report of Dr. Homer Venters

roles, I was also responsible for evaluating and making recommendations on the health

implications of numerous security policies and practices, including correctional officer responses

to patients in distress and medical observation. My responsibilities during this time also included

review and approval of all medical and mental health policies, including those relating to intake

health assessments, chronic care and sick call, emergency responses, mental health and substance

abuse care, infirmary care and transfer of patients for higher levels of care. I have also provided

training to correctional staff, reviewed and made contributions to correctional policies regarding

identification and working with incarcerated people with disabilities, whether intellectual,

behavioral health or physical.

In March 2017, I left Correctional Health Services of New York City to become the Director of

Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for

Human Rights, including training of physicians, judges, and law enforcement staff on forensic

evaluation and documentation, analysis of mass graves and mass atrocities,

documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

Between December 2018 and April 2020, I served as the Senior Health Fellow and

President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit

organization that promotes evidence-based improvements to correctional practices across the

United States. I have also worked as a medical expert in cases involving correctional health since

2017, and I published a book on the health risks of jail (Life and Death in Rikers Island) that was

published in early 2019 by Johns Hopkins University Press.

Expert report of Dr. Homer Venters

Since April 2020, I have worked on COVID-19 responses in detention settings. During

this time, I have conducted court-ordered inspections of detention facilities to assess the

adequacy of their COVID-19 responses in ICE detention centers, county jails, and state and

federal prisons. I was also named as an independent monitor for COVID-19 response for both the

Connecticut State Prisons and the Hawaii Department of Corrections, and I was named as

COVID-19 inspector by a Federal Court for the Bureau of Prisons facility in Lompoc, California.

I have also been named as Federal Court-appointed monitor for the health services in the Santa

Barbara, California county jail, the Fluvanna Prison for Women in the Virginia Department

of Corrections and the Criminal Justice Complex in St. Thomas, United States Virgin Islands.


A copy of my curriculum vitae is attached to this report as Exhibit A. My fees for this report are

$500 per hour to review documentation and to write a report regarding my findings and expert

opinions. In addition, I charge $500 per hour for deposition and court testimony. Finally, I

charge $250 per hour for travel time and actual expenses for travel costs such as mileage, hotel,

airfare, car rental, and meals. My compensation is not contingent upon my conclusions or

opinions.


### B.  Role and Information Reviewed


I have been retained by counsel for Mr. Donny Phillips (Case No. 3:22-cv-997-BJD-LLL, U.S.

District Court, Middle District of Florida Jacksonville Division) to review the adequacy of care

and accommodation provided to Mr. Phillips while incarcerated in the Florida Department of

Corrections (FDC). My particular focus in this review is the level of health services, supplies and

Expert report of Dr. Homer Venters

accommodation that Mr. Phillips needed and the adequacy of response by FDC's health and

security staff. I understand that the focus of the current litigation is care and accommodation

provided to Mr. Phillips since he was transferred to Suwannee Correctional Institution in October

2020. In order to formulate my opinions in this case, I have reviewed the following:

- Medical records for Mr. Phillips from care during FDC incarceration 2014-2022.

- Grievances submitted by Mr. Phillips and responses from FDC during his incarceration.

- Amended complaint in Phillips v. Dixon (Case No. 3:22-cv-997-BJD-LLL).

- Expert opinions of Dr. Jason Chertoff, Dr .Donald Kern.

- Photographs of Mr. Phillips

- Defendants' interrogatories to Mr. Phillips and plaintiffs' responses.

## C.  Areas of Concern

Concerns prior to the Preliminary Injunction

Mr. Phillips is a 62-year-old man who began serving his current sentence in FDC in 2013 at

Mayo Correctional Institution. At the time of his intake, Mr. Phillips was reliant on use of a

wheelchair because of longstanding paraparesis or incomplete paraplegia secondary to prior

spinal cord injury and incontinence of bowel and bladder. When injury to the spinal cord results

in most but not all sensory and motor function of nerves (and connected muscles) below the

point of injury, this condition is often referred to as incomplete paraplegia or paraparesis. The

difference in the two terms relates to whether the term refers specifically to the spinal cord injury

Expert report of Dr. Homer Venters

itself, or the functional result of retaining some limited motor or sensory capacity.[1] I have utilized the term paraparesis below which reflects a focus on the functional status of Mr. Phillips, which has clearly and consistently been serious but not total loss of motor and sensory function. The fact that Mr. Phillips' injury was serious but not complete is very relevant to this case, because it appears that in his initial years, in FDC, he was diagnosed as having paraplegia, or total loss of spinal cord function. Later, after a transfer to a new facility, it appears that because he was observed as having some limited mobility, consistent with his longstanding status of having paraparesis, staff took measures to remove care and support without acknowledging that he had paraparesis.

Prior to his incarceration, Mr. Phillips reports that he had no problems with decubitus ulcers or recurrent skin infections, and that he attributes his lack of these problems to a close attention to hygiene, including use of adequate incontinence briefs, regular washing and wiping of his skin when exposed to fecal matter or urine, and use of clean towels and washcloths and antibacterial soap and barrier creams.

In his initial year of incarceration n FDC, Mr. Phillips started to report and encounter problems relating to his disability and need for accommodation. Some of Mr. Phillips' FDC records in 2014 documented that he did not work in the community because of his disability but was nonetheless given a violation from FDC for not working 6/6/14, which reported that his violation stemmed from "not performing houseman duties." Later on 10/19/14, Mr. Phillips reported that he was unable to get sufficient incontinence briefs, needing 3 per day. His grievance reported multiple days on which he was not given any incontinence briefs, requiring him to reuse a "dried

---

[1] https://pubmed.ncbi.nlm.nih.gov/19277459/

Expert report of Dr. Homer Venters

out soiled diaper". The response by health staff to this issue was that the incontinence briefs/diapers "are available to you as needed" and stated that "A careful review of your medical record does not substantiate your claim that you are not being provided diapers." There is no effort to address the central claim in Mr. Phillips' actual grievance that he was unable to receive an *adequate* supply of diapers, three per day. There is also no response to the report that on specific dates in October 2014 he was unable to receive any diapers. In sidestepping the problem being reported by Mr. Phillips (about an intermittent and inadequate supply) the health services narrows their focus to whether diapers are ever provided and concludes "Based on the foregoing, grievance is hereby DENIED" The reality for Mr. Phillipps is that he requires three large pull up style diapers per day and when the wrong size, quantity or type are offered, the result is that he is unable to prevent long period of having urine and feces on his skin.

This cycle of intermittent and inadequate access to diapers, wipes and other basic medical supplies required by Mr. Phillips plays out on a nearly constant basis from 2014 to the present. Among the scores of grievances filed by Mr. Phillips, a significant percentage relate to not being able to access adequate pull-up diapers, wipes, barrier creams, and other medical supplies.

The lack of adequate medical supplies and care for Mr. Phillips, together with a denial or dishonoring of bathroom and shower passes, have resulted in life-threatening infections and significant deterioration of his health, as well as pain and suffering.

The initial infection suffered by Mr. Phillips occurred in July 2018, when he developed redness, swelling and pain on his right leg, characteristic of cellulitis. Medical records show that he was

Expert report of Dr. Homer Venters

treated with antibiotics and warm compresses in the infirmary but that upon return to general population housing, he returned to his prior lack of access to adequate sanitation supplies. As Mr. Phillips struggled with FDC health and security staff, his right leg cellulitis failed to resolve. Dr. Chertoff's expert report from 2019 cites this lack of adequate supplies as a contributor to Mr. Phillips's leg cellulitis not improving, specifically mentioning the inability to maintain adequate hygiene, medical supplies and the "deplorable sanitary conditions" he was subject to. Dr. Donald Kern similarly opined in February 2019 that his review of medical records and other evidence in Mr. Phillips case demonstrated that the record reflected continuing concerns over the quantities of supplies he was provided and limitations on his access to toilet and shower. Dr. Kern reported "To a reasonable degree of medical certainty, his inability to maintain good skin hygiene has resulted in multiple bouts of infection (cellulitis) both bacterial and fungal. Further, Incontinence of bowel and bladder with inability to maintain good skin hygiene potentially exposes Mr. Phillips to nontypical bacterial skin infections from bowel bacteria rather than the usual skin bacteria. Such infection may progress farther and become more serious before treating staff recognize the different source of Infection."

In March 2019, Mr. Phillips's sought and was granted a preliminary injection by the U.S. District Court for the Northern District of Florida to mandate that he be provided 5 or more diapers per day as well as other basic hygiene supplies including soap, wipes, barrier creams and passes for bathroom and shower access. These basic accommodations represent the fundamental health measures that Mr. Phillips had relied upon to remain healthy before his incarceration, and that he had been denied in a consistent and adequate manner since his incarceration. In the weeks after the preliminary injunction was ordered, access for Mr. Phillips to these supplies, as well as the

clinical condition of his cellulitis greatly improved. As the expert opinion of Dr. Chertoff reports "Since the initiation of the Court's sanitary and personal hygiene protocol, by all accounts, as documented in Mr. Phillips' medical record from numerous healthcare providers, Mr. Phillips' right leg cellulitis has resolved. He's no longer on antibiotics, and his pain, redness, warmth, and edema have all improved, but not entirely disappeared." By this time, in 2019, it was clear that Mr. Phillips was a patient who required access to considerable amounts and consistency of accommodation, medical care and supplies to prevent serious health complications. Dr. Chertoff wrote in 2019, "Donny Phillips has an exceptionally high risk of developing a recurrence of his cellulitis or another soft tissue infection." And provided extensive evidence from his review of the medical literature, as well as the medical records of Mr. Phillips to support his opinion.

One prominent feature of Mr. Phillips case is the retaliation against seeking care or and linkage between punishment and care interruption by FDC staff. Even after the preliminary injunction in 2019, Mr. Phillips reported on 10/3/19 that security staff in his housing area took away medical supplies. A month later, Mr. Phillips reported an incident in which he was physically stopped from using the bathroom and assaulted by another incarcerated person in his housing area, which resulted in him sitting in soiled diaper for a prolonged period of time. The response to this report was to offer the opportunity to refer to the Inspector General's office, but no effort was made in the response to devise a system that ensure access to the bathroom for Mr. Phillips. The next month, Mr. Phillips reported on 11/7/19 that security staff cursed at him and withheld toilet paper in retaliation for him speaking with medical staff about needing toilet paper. Shortly thereafter, Mr. Phillips reported another instance on November 13th, 2019 during which he was not able to obtain toilet paper from an officer and another on 12/2/19. On 12/18/19, Mr. Phillips reported

Expert report of Dr. Homer Venters

that he was again told there was no toilet paper for him and additionally he reported being out of his medical wipes. Mr. Phillips reported that during a search on 1/3/20, officers threw his diapers on the floor and made threats against him. This grievance also details that when Mr. Phillips was seen by medical, they offered to replace his diapers with a smaller size that did not fit him, and then asked him to sign a refusal form when he did not agree to this plan. FDC then denied this grievance on the basis that Mr. Phillips was offered and refused his replacement diapers, without any allowance or mention of the improper size or his inability to actually use them.

<u>Concerns since the Preliminary Injunction</u>

Since the preliminary injunction was ordered in this matter, it is apparent that Mr. Phillips has continued to receive intermittent access to medical supplies and care, and that he has continued to suffer from skin infections. In a grievance from 12/20/19, Mr. Phillips reports not having toilet paper or medical wipes. This grievance was denied because FDC opined that Mr. Phillips had used the wrong form for his toilet paper request and simply stated that his medical supplies are issued to him once per week. Another grievance 3/30/20, Mr. Phillips reported that he was unable to move about the facility with the diapers and supplies he needed to keep with him. His grievance was denied and FDC stated that his wheelchair did not come with this type of pocket and that if he desired such a pocket for his wheelchair, his family should purchase one for him to use. Records indicate that upon being transferred to Suwannee C.I. in October 2020, his existing orders for medical wipes, diapers, antiseptic soap were either discontinued or interrupted. Mr. Phillips' medical records indicate that within days, both he and his sister were reporting the need for these medical supplies to health staff in the facility. His initial written grievance, dates 11 days after his transfer, reports "I need to get all my medical supplies/I have no pull-up diapers

Expert report of Dr. Homer Venters

since coming to this facility on 10/15/20." An encounter with Dr. Figueroa two days later questions the need for these supplies, "I don't recommend wipes or pull ups bc patient is continent and has no rash." This encounter goes on the state that Mr. Phillips had been using his compression stockings incorrectly, without any apparent explanation of what was incorrect or how Mr. Phillips should change his use of these devices. There is no referral for physical therapy or mention of Mr. Phillips's functional status in terms of walking, transferring or ability to use the shower or toilet, with or without ADA accommodations. There is no indication in this encounter that Dr. Figueroa reviewed the prior medical records and assessments for which these supplies had been previously ordered. Of note, there is no mention by Dr. Figueroa or evidence that he reviewed the current FDC Disabled Inmate Management and Service Plans, dated 10/14/20 and 9/9/20, which note as part of the current management plan "urinal, 1pk wipes/week, 2 pk L pull ups/wk, hibiclense QOD, dial soap weekly, skin protectant ointment weekly, prophet boot, gloves". Subsequent notes in Mr. Phillips' medical records show that his request for passes were similarly denied. These actions by medical staff at Suwannee CI indicate that because he was observed as having some limited mobility, consistent with his longstanding status of having paraparesis, staff took measures to remove care and support without acknowledging that he had paraparesis.

During this time, Mr. Phillips also reports that his transfer into the medical infirmary interrupts his drug treatment program and that he is concerned this transfer is punitive. His medical records do not make clear the reasons for this transfer, and it does not appear that the placement resulted in any of the comprehensive assessments staff would need to undertake to undo his prior care and orders for supplies.

Expert report of Dr. Homer Venters

In the following weeks, Mr. Phillips continues to submit medical grievances reporting that he has not been provided any diapers, medical wipes or other medical supplies he had previously been provided, and there is no new physical therapy, urology or functional status assessment of his ability to walk, use the shower or toilet with or without ADA accommodations or other basic assessment of his physical status during this time. In his grievance of 11/5/20, Mr. Phillips specifically notes the danger of recurrent cellulitis as a potential consequence of not receiving these supplies and accommodations.

It appears that near the end of 2020, and into January of 2021, the facility began to give back some of the basic medical supplies that Mr. Phillips had previously been prescribed, but that this access continued to be intermittent.

A grievance from 9/1/22 reports that health staff had provided diapers to Mr. Phillips but refused to give him any medical wipes. This grievance was denied and the FDC response justified the denial because the wipes were unavailable due to being backordered. This represents a systemic problem with the FDC grievance process, because whether or not Mr. Phillips receives medical wipes, diapers, soap, a working wheelchair, adequate and timely healthcare encounters or any other necessary health service is unrelated to the reason for it being not available. The allegation or concern about the lack of supplies representing retaliation is a serious one, but the health service's initial obligation is to assess whether the service was provided. This is another example of the grievance responses in Mr. Phillips' case focusing on one narrow element of a report and ignoring the basic and large issue of whether or not services were made available.

This period in September 2021 marks a concerning worsening for Mr. Phillips's clinical status, again coincident with deteriorating access to basic medical supplies. Medical records for Mr.

Expert report of Dr. Homer Venters

Phillips show that the July skin check/assessment was done late, in early August, and that this encounter noted no areas of skin compromise or breakdown of the right leg were observed and a Braden score of 20 was documented. Two weeks later, a nursing encounter checks the box for "Area over the ankle, calf, or thigh is warm/hot to touch and/or is red." This note includes scores that are inconsistent with the basic condition of Mr. Phillips including the top score of 4 (reflecting no problems at all) for sensory perception, walking frequently, and rarely having moist skin. For a person who is mostly wheelchair bound and uses 3-5 diapers per day, this is not possible. My own experience is that under-reporting or under-scoring in correctional health results in avoidance of automatic requirements for physician referral. This box is contained in a short list of more serious findings, labelled "FINDINGS REQUIRING IMMEDIATE CLINICIAN NOTIFICATION". There is no documentation in the assessment/plan of this note that the clinician was notified. A skin protocol encounter is present from 11/12/21 in which Mr. Phillips reports that his "leg is leaking" and his pulse is recorded as 106. The skin protocol assessment filled out by nursing staff note the presence of at least one area of pustule (circumscribes raised lesion that contains pus) as well as crust (covering formed by the drying of serum, blood or pus on the skin). There is no apparent referral to a physician or mid-level provider or even basic assessment and plan contained in this encounter note, and it appears as if the second page of the encounter is missing from the medical records. The next clinical note in Mr. Phillips medical records occurs on 11/17/21. The same finding regarding calf/ankle swelling is checked in this nursing form. A physician encounter from that day is also present which documents erythema and dry scaling without active discharge on Mr. Phillips right leg.

12

Expert report of Dr. Homer Venters

In the following weeks, Mr. Phillips submitted grievances that he was out of one of the ointments used on his right leg and that it would be reordered, which did not occur. He also reported lacking other basic supplies including diapers, medical wipes and antiseptic skin cleanser. One of the FDC responses during this time states "There are no valid passes in your chart for the requested supplies."

More recent concerns reported by Mr. Phillips include not being able to obtain his ADA boots, which he requires to walk behind his wheelchair during therapy reported on 9/16/22 and 10/3/22. These requests/reports are denied with the judgement that "Shoes & Boots are NOT ADA." These responses also direct Mr. Phillips to take his needs up with clinical staff, but do not appear to address that he has already tried to do exactly that.  In the same month, Mr. Phillips reported that he was unable to shower in a confidential manner, a grievance that was denied by FDC.

Medical records in late 2022 (the most recent records I have reviewed) indicate that Mr. Phillips is housed in a general population setting, is scheduled for monthly skin checks with health staff and that he is ordered to receive large size diapers, medical wipes and antiseptic soap.
A letter from March 9th, 2023 from Mr. Phillips' counsel to FDC reports that the wound care encounters were stopped in late 2022 and re-started in 2023. A photo presented by Counsel of Mr. Phillips right leg shows clear areas of skin breakdown with open and drying lesions present. His leg also shows the scarring and discoloration from his previously reported cellulitis & venous insufficiency.

13

Expert report of Dr. Homer Venters



### D.  Summary and Recommendations

My own experience as the Chief Medical Officer of a large correctional health service is that when a patient has health needs that exceed the capacity or resources available in general population, then a transfer to a higher level of care is required when it becomes clear that adequate care and resources cannot be brought to the general population setting. In the case of Mr. Phillips, it was apparent as early as 2014 that he requires multiple daily diapers as well as wipes, soap and the ability to use bathrooms and showers throughout the day due to incontinence. It was also apparent in 2014 that he was not able to receive these basic accommodations, and that both the health and security services were failing to meet these needs.

The repeated and consistent grievances filed by Mr. Phillips, as well as his numerous contacts with health staff in 2014 and 2015 should have prompted a move to a sheltered housing area or other housing location where these needs could be met. After Mr. Phillips developed cellulitis of his right leg in 2018, FDC did transfer him to an infirmary for a short period of time for his acute treatment, but upon return to general population, he quickly ran into the same problems, but with the added consequence that his leg infection became chronic. What Mr. Phillips needed was

14

Expert report of Dr. Homer Venters

housing in an area where he had unfettered access to showers, bathroom and the medical supplies he required, something that is often available in a step-down, nursing or sheltered housing area that houses people with chronic health problems who do not need an acute infirmary bed.

My own experience leading a large correctional health service is that patients like Mr. Phillips who have serious and chronic health problems that require medical equipment and supplies will not be able to consistently receive the care they need in most general population settings, and that their access to care and supplies will wax and wane depending on numerous factors outside their control. For patients that advocate for themselves in these settings, friction quickly develops between them and both health and security staff, and retaliation against them simply seeking care can occur. One of the consequences of this friction, is that patients may be forced into coping strategies that can further threaten their health. One example of this is the repeated references by Mr. Phillips to using his face cloth as an overall body wipe when he is not supplied with diapers and medical wipes. The repeated exposure of his eyes, mouth and nose to his own fecal material, even with efforts to rinse and wash his face cloth in between uses, represents a serious new risk of infection that comes from his efforts to cope with a preventable and unnecessary lack of accommodation.

Mr. Phillips has several medical concerns that make reliance on the general population sick call system a dangerous and risky situation. First, he has a documented history of both cellulitis and deep vein thrombosis (DVT), a type of blood clot that often first appears with swelling and pain the calf, much like cellulitis. Distinguishing between these two problems must occur immediately if treatment for the DVT is to be initiated and prevention of migration of the clot to

Expert report of Dr. Homer Venters

the lungs or elsewhere is to be maximized. Second, Mr. Phillips has venous stasis changes to his lower legs, which can also cause skin discoloration and breakdown. Venous stasis changes can be mistaken for cellulitis (or vice versa), but they can also provide the initial break in the skin that allow for bacteria to enter and start a new cellulitis.[2] Review of photos provided by Counsel form 2021 and 2023 clearly indicate multiple areas of skin breakdown as well as scarring and discoloration of the skin. Treatment of venous stasis often aims to reduce the pressure inside the veins of the legs, which can be achieved through exercise, which is difficult for Mr. Phillips, through some local applications of pressure stockings or dressings, as well as via medications that lower overall pressure or increase excretion of water. Mr. Phillips' medical records indicate that the diuretic Lasix has been prescribed in the past for this reason. While some of these concerns may not appear to change from day to day, such as the chronic venous stasis marks on Mr. Phillip legs, it is essential that he be in a setting where a new infection or a new clot in his leg can be immediately assessed and treated. It is also important to consider that Mr. Phillip has already experienced each of these three medical problems, DVT, venous stasis and cellulitis and the opinions of Drs Kern and Phillips make clear that a return of cellulitis can pose serious risks to Mr. Phillips' health. A DVT can be fatal if the clot migrates to the lungs and forms a pulmonary embolism. My own experience in correctional health is that the objective of managing these serious and overlapping clinical presentations is much more likely to be met when patients who have complex health needs are housed in specialized settings.

FDC has the capacity to accommodate these needs and should do so. I understand that at least three facilities have specialized wound care programs, housing areas for people with some mix

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9968263/

Expert report of Dr. Homer Venters

of complex health issues and mobility concerns, problems that are concentrated among older incarcerated people. I recommend the following actions based on the information I have reviewed;

1. Transfer Mr. Phillips to a facility or housing area for patients with complex medical and mobility needs. This type of setting is sometimes organized for older people, or for those with both mobility and medical needs. The benefit of this type of setting is that most people who meet these criteria require more frequent health encounters, require unimpeded shower & bathroom accommodation, require uninterrupted access to medical supplies (instead of waiting for the sick call or grievance systems. Concentrating these high needs patients in one or several housing areas of a facility allows the correctional health service to bring health professionals with specific expertise to those most in need, including physical therapy, geriatrics, wound care and chronic disease. This approach also allows for the training of correctional officers in the increased needs for the services and resources these patients have. Mr. Phillips meets the basic criteria for this type of placement, given his extensive medical history, wheelchair reliance, and ongoing struggles with wound care and potential infection.

2. Ensure monthly skin checks for Mr. Phillips' lower extremities using a standardized assessment such as the FDC skin protocol.

3. Ensure access to medical supplies including pull-up diapers (at least three large pull-up style), adequate supplies of medical wipes (80 per week), antiseptic soap, and barrier creams/skin protectants.

Expert report of Dr. Homer Venters

4.  Ensure unimpeded access to toilet paper and unimpeded use of the bathroom and shower and medical passes to facilitate this access.

5.  Ensure that a privacy partition or other privacy accommodation exists for Mr. Phillips when showering.

These opinions are based on my review of the information indicated in this report. I remain open to review of additional information and analysis if required. The opinions I present in this report are made to a reasonable degree of medical certainty and are based on my professional experience, expertise and training.

Executed on this 28th of July, 2023 in Port Washington, New York.

_____

Homer Venters, MD, MS

# Dr. Homer D. Venters
hventers@gmail.com,

| **Health Administrator** | **Physician** | **Epidemiologist** |

## *Professional Profile*

○ Award winning epidemiologist focused on the intersection of health, criminal justice and human rights.
○ Leader in provision and improvement of health services to patients with criminal justice involvement.
○ Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
○ Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
○ Independent correctional health monitor
  ➢ Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.
  ➢ Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
  ➢ HI Department of Corrections (COVID-19 only 9/2021-3/2022)
  ➢ CT Corrections Department (COVID only, 2020). Oversee and report on the adequacy of COVID-19 responses with other monitoring panel members throughout CT DOC combined jail/prison system.
  ➢ VI Department of Corrections (ongoing). Serve as independent, court-appointed monitor of health services in 2 detention facilities.
○ U.S. Department of Justice, Civil Rights Investigations medical expert, 2019-present. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
○ Review COVID-19 policies and procedures in congregate settings including in-person inspections of;
  ➢ MDC Brooklyn (BOP), NY
  ➢ MCC Manhattan (BOP), NY
  ➢ FCI Danbury (BOP), CT
  ➢ Cook County Jail, IL
  ➢ Broome County Jail, NY
  ➢ Sullivan County Jail, NY
  ➢ Shelby County Jail, TN
  ➢ Farmville Detention Center (ICE), VA
  ➢ Lompoc Prison (BOP), CA
  ➢ Southern Mississippi Correctional Facility, MS
  ➢ Central Mississippi Correctional Facility, MS
  ➢ FDC Philadelphia (BOP), PA
  ➢ Osborn Correctional Institution, CT
  ➢ Robinson Correctional Institution, CT

- ➤ Hartford Correctional Center, CT
- ➤ Dallas County Jail, TX
- ➤ Cheshire Correctional Institution, CT
- ➤ Calhoun County Jail, MI
- ➤ York Correctional Institution, CT
- ➤ Chesapeake Detention Facility Re-inspection, MD
- ➤ Pender Correctional Institution, NC
- ➤ Craven Correctional Institution, NC
- ➤ Central Prison, NC
- ➤ North Carolina Correctional Institution for Women, NC
- ➤ Chesapeake Detention Facility Re-inspection, MD
- ➤ Broward County Jail, FL
- ➤ Lompoc Prison Re-inspection (BOP), CA
- ➤ Maricopa County Jail, AZ
- ➤ Northeast Florida State Hospital, FL
- ➤ Florida State Hospital, FL
- ➤ Western Regional Jail, WV
- ➤ Northern Regional Jail, WV
- ➤ Tygart Regional Jail, WV
- ➤ Women's Community Correctional Center, HI
- ➤ Halawa Correctional Facility, HI
- ➤ Oahu Community Correctional Center, HI
- ➤ Maui Community Correctional Center, HI
- ➤ Kauai Community Correctional Center, HI
- ➤ Clayton County Jail, GA
- ➤ Cummings Unit Prison, AK
- ➤ Varner Unit Prison, AK
- ➤ Ouachita Unit Prison, AK
- ➤ East Arkansas Regional Unit, AK
- ➤ Southern Regional Jail, WV
- ➤ North Central Regional Jail, WV
- ➤ Eastern Regional Jail, WV
- ➤ Lompoc Prison Re-inspection (BOP), CA

- ○ Conduct analysis of health services and outcomes in detention settings.
- ○ Conduct site inspections and evaluations in detention settings.
- ○ Produce expert reports, testimony regarding detention settings.

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-10/31/21
- ➤ Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.
- ➤ Work with Task Force and Federal partners to produce final report, recommendations and implementation plan for reducing inequities in COVID-19 and other pandemic responses.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
- ○ Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- ○ Oversee operations and programmatic development of COCHS
- ○ Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018

o       Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.

o       Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.

o       Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.

o       Initiate vicarious trauma program.

o       Expand forensic documentation of mass killings and war crimes.

o       Develop and support sexual violence capacity development with physicians, nurses and judges.

o       Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.

o       Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.

o       Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.

o       Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).

o       Reduced overall mortality in the nation's second largest jail system.

o       Increased operating budget from $140 million to $160 million.

o       Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.

o       Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.

o       Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.

o       Increased operating budget of health service from $115 million to $140 million.

o       Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.

o       Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.

o       Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.

o       Direct all aspects of response to infectious outbreaks of H1N1, Legionella,

Clostridium Difficile.
o        Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o        Developed training program with Montefiore Social internal medicine residency program.
o        Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## Education and Training

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert        Einstein University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure

Adjunct Faculty, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## Print articles and public testimony

Testimony: United States House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security, Judiciary Committee 1/21/22.

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction. NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet*. 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet*. 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care*. 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved*. 4/28/17.

MacDonald R, Akiyama MJ, Kaba F, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**.  Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved*. In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet*. 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep*. 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care*. 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health*. 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health*. 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health*. 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health*. 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public*

*Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved*. 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care*. 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:   Patient   safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142.

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209217.

## *Honors and Presentations (past 10 years)*

**Invited presentation,** COVID-19 and Carceral Health, Stanford University Schools of Engineering and Public Health, 2/23/22.

**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote,

September14th, 2020.
**Invited presentation,** Screening and treatment for sexually transmitted infections in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited Presentation,** Decarceration and Health. Radcliffe Institute/Harvard University. Policy Series. Remote. 6/23/20.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health

Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J,

Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## Grants: Program

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

*Other Health & Human Rights Activities*

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Draconculiasis Eradication, Togo West Africa, June 1990-December 1991.

*Books*

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

*Chapters in Books*

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

*Prior Testimony and Deposition*

- Benjamin v. Horn, 75–cv–03073–LAP (S.D.N.Y.). Expert for Defendants 2015.
- Newbrough v. Piedmont Regional Jail Authority, 3:10CV867–HEH (E.D.V.A. 2011). Expert for Plaintiffs.
- Rodgers v. Martin, 2:16-cv-00216 (N.D.T.X.). Expert for Plaintiffs 10/19/2017
- Fikes v. Abernathy, 7:16-cv-00843-LSC (N.D.A.L.). Expert for Plaintiffs 10/30/20017
- Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.N.Y. 2017). Defendant in role as City Employee, 4/10/2018.
- Charleston v. Corizon Health Inc., 2:17-cv-03039-MAK (E.D. P.A.). Expert for Plaintiffs 4/20/2018.
- Atencio v. Board of Cnty. Comm. of Sante Fe Cnty., 1:17-CV-00617 WJ/KK (N.M.). Expert for Plaintiffs 7/23/2018.
- Hammonds v. Dekalb Cnty. , 4:16-cv-01558-KOB (M.D.A.L.). Expert for Plaintiffs 11/30/2018.
- Mathiasen v. Rio Arriba Cnty., 17-CV-1159 JHR/KBM (N.M.). Expert for Plaintiff 2/8/2019.
- Hutchinson v. Bates, 2:17-cv-00185-WKW-SMD (M.D.A.L.). Expert for Plaintiff 3/27/2019.
- Lewis v. East Baton Rouge Parish, 3:16-cv-00352-JWD-RLB (M.D.L.A.). Expert for Plaintiff 6/25/2019, 7/1/2019.

- Belcher v. Lopinto., 2:18-cv-07368-JTM-DPC (E.D.L.A.). Expert for Plaintiffs 12/5/2019.
- Imperati v. Semple, 3:18-cv-01847-RNC (C.T.) Expert for Plaintiffs 3/11/2020.
- Camera v. Semple, 3:18-cv-01595 (C.T.). Expert for Plaintiffs 9/23/2020.
- Staten v. Semple, 3:18-cv-01251 (VAB) (C.T.). Expert for Plaintiffs 2020.
- Woodward v. Lopinto, 2:18-cv-04236-MVL-KWR (E.D.L.A). Expert for Plaintiffs 12/1/2020.
- U.S. v. Pratt, 2:19-cr-00213-DWA (W.D.P.A.). Expert for Defendant 4/28/2020 (Video hearing).
- U.S. v. Nelson, 1:19-cr-00021-DSC (W.D.P.A.). Expert for Defendant 5/4/2020 (Video hearing).
- Chunn v. Edge, 1:20-CV-01590-RPK-RLM (E.D.N.Y.) Expert for Plaintiffs 4/30/2020 (Video deposition), 5/12/2020 (Video hearing).
- Martinez-Brooks v. Easter, 3:20-cv-569 (MPS) (C.T.). Expert for Plaintiffs 6/8/2020 (Video deposition), 6/11/2020 (Video hearing).
- Baxley v. Jividen et al. NO. 3:18-cv-01526, 7/1/21 Expert for Plaintiffs (Video Hearing).
- Busby v. Bonner, 2:20-cv-02359-SHL (W.D.T.N.). Expert for Plaintiffs 7/10/2020 (Video hearing).
- Braggs v. Dunn, 2:14-cv-601-MHT (M.D.AL.). Expert for Plaintiffs 10/19/2020 (Audio testimony).
- Royston v. Christian, 6:19-cv-00274-RAW (E.D.O.K.). Expert for Plaintiffs 3/26/21 (Video deposition).
- Fraihat  v. U.S. Immigration and Customs Enforcement, 5:19-cv-01546-JGB-SHK (C.D.C.A.). Expert for Plaintiffs 2020.
- Torres v. Milusnic, CV 20-04450-CBM-PVC(x) (C.D.C.A). Court appointed expert 5/24/21 (Video deposition).
- Sanchez v. Brown, 20-cv-832-E (N.D.T.X.). Expert for Plaintiffs 5/25/21 (Video deposition).
- Barnett v. Tony, No 0:20-cv-61113-WPD 10/13/21 Expert for plaintiffs (Video hearing).
- Fenty, et al., v. Penzone, et al., No. 2:20-cv-01192. Expert for Plaintiffs 10/21/2021 (Video hearing).
- Scott v. Clarke 3:12CV36. Court appointed monitor. Hearing 2/7/22 (Video testimony).
- Thomas Rainey v. County of San Diego, et al., No  CASE NO. No.: 19-cv-01650-H-AGS.. 3/21/22 Expert for Plaintiffs (Video Deposition).
- Frankie Greer v. County of San Diego, et al., No  CASE NO. 19-CV-0378-GPC-DEB. 4/27/22 Expert for Plaintiffs (Video Deposition).

*Consulting Rates*

- *$500/hour for consulting*
- *$250/hour for travel time plus expenses*