UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DONNY PHILLIPS,

    Plaintiff,

v.

RICKY D. DIXON,

    Defendant.

Case No. 3:22-cv-997-BJD-LLL

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
SECRETARY DIXON'S[1] MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Local Rule 3.01, and paragraph 3 of the Court's Scheduling Order (Doc. 37), Plaintiff Donny Phillips files this response in opposition to Dixon's motion for summary judgment (Doc. 110), along with his summary judgment evidence (Doc. 114 & 115). As explained below, Dixon's motion fails because he has not met his burden under Rule 56 to show that there is no genuine dispute of material fact as to the issues outlined in the motion.[2] He fails to convincingly develop his theory of res judicata and cannot explain to the Court how a release for a prisoners' injuries in one lawsuit can bar any future claims over

---

[1] The terms "Dixon," the "Secretary," "Florida Department of Corrections," and "FDC" are used interchangeably herein to refer to Defendant Ricky Dixon, Secretary of the Florida Department of Corrections.

[2] As the Court knows, Plaintiff has not received from Dixon all the records ordered by the Court. (Doc. 108). That said, Plaintiff would ask that motion be resolved despite Dixon's failure to produce all compelled records. As explained herein, because Dixon has not met his burden in the first instance, the motion should be denied.

worsening conditions while the prisoner remains within the state penal system's custody. He also cannot show that there is no genuine dispute of material fact as to Plaintiff's claim under Title II of the Americans with Disabilities Act/Section 502 of the Rehabilitation Act or that it is really a vicarious liability claim in disguise.[3]

## Statement of Material Facts

### *Plaintiff is a Qualified Individual under the ADA*

1. Plaintiff Donny Phillips suffers from bladder and bowel incontinence due to a spinal injury which prevents him from feeling when his bladder or bowels are full, and he often must quickly access a toilet or rely on adult diapers. Deposition of Donny Phillips (Doc. 114-1 at 19:18-21:16).

2. Plaintiff also suffers from incomplete paraplegia (paraparesis), venous insufficiency, a history of blood clots, poor circulation, obesity, and a history of repeated cellulitis—a soft tissue infection that can lead to sepsis, amputation, and death. *See* Plaintiff's Verified Answer to FDC's Interrogatory No. 4 (Doc. 114-3 at PageID 2054–59).

3. For years Plaintiff encountered denial of the hygiene supplies he required to cope with his bladder and bowel incontinence because he was considered

---

[3] Plaintiff's remaining claims are moot because he was released from prison in April 2024: https://fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=789552&TypeSearch=IR.); *see also* Declaration of Donny Phillips (Doc. 115) ¶ 4. He therefore need not address Dixon's misplaced Eleventh Amendment immunity argument as to Plaintiff's injunctive claims under the First and Eighth Amendments or whether he has sufficiently stated those claims. Accordingly, Plaintiff only addresses the arguments relative to the sole surviving claim under the ADA/RA.

a "writ-writer"[4] by prison staff. (*Id.*); (Doc. 114-1 at 39:3-40:7).

4. Because of the lack of necessary hygiene supplies, Plaintiff had to compensate by using the toilet regularly, though he would often have accidents. (Doc. 114-3 at Verified Answer No. 1 (PageID 2051) & Verified Answer No. 4(c) & (f) (PageID 2056, 57)) one time, Plaintiff possessed bathroom and shower passes, but for the past nearly three years at FDC, he was denied passes for open bathroom access, as well as for showers to clean himself after accidents. (*See id.* at Verified Answer Nos. 3 & 4); (Doc. 114-1 at 38:9-39:16).

5. The medical and security staff at Suwannee Correctional Institution, where he was confined throughout this lawsuit until he was moved in response to Plaintiff's motion for a preliminary injunction, would intermittently withhold, or reduce hygiene supplies (adult diapers, barrier creams, antiseptic soaps, sanitary wipes) and fail to issue or honor bathroom and shower passes to allow him to clean himself. (Doc. 114-1 at 38:13-39:2). Those failures created dangerous conditions for Plaintiff. (*Id.* at 174:10–75:8).

6. For example, at times Plaintiff had been denied diapers, provided too few diapers for his needs, or provided diapers too big or too small to fit him, resulting in a combination of feces and urine from running down his legs. (*Id.* at 30:1-7); (Doc. 114-3 at Verified Answer No. 3). The failure to provide appropriate hygiene supplies had caused repeated and prolonged exposure to fecal bacteria, which, in 2018

---

[4] "Writ-writer" is a prison term for a prisoner who files frequent grievances or lawsuits. (*See* Doc. 114-3 at Verified Answer to Interrogatory No. 4(a)).

3

brought on Mr. Phillips's documented and diagnosed cellulitis. (Doc. 114-1 at 39:3-16); (Doc. 114-3 at Verified Answer No. 4(f) (PageID 2057)). With cellulitis, repeated exposure to urine and fecal bacteria can create conditions that can quickly lead to sepsis, gangrene, amputation, septic shock, and death. *See* Report of Dr. Jason Chertoff (Doc. 114-7 at PageID 2146).

### *Plaintiff Seeks Court Intervention to Provide Sanitary Supplies*

7.  In 2018, Mr. Phillips sued the FDC, private medical contractors, and several individuals pertaining to unlawful conduct at Franklin Correctional Institution and Northwest Florida Reception Center (NWFRC). *Phillips v. Inch*, No. 4:18-cv-139-MW-CAS (N.D. Fla.).[5]

8.  There, Plaintiff disclosed a report by his correctional medical expert, Dr. Donald Kern, M.D., who concluded to a reasonable degree of medical certainty that Mr. Phillips's "inability to maintain good skin hygiene has resulted in multiple bouts of infection (cellulitis) both bacterial and fungal." *See* Report of Dr. Kern (Doc. 114-4 at PageID 2076). In that disclosed report Dr. Kern concluded that

> Each bout of cellulitis may cause further damage to an already impaired circulatory system, which in turn may lead to further edema and further difficulty maintaining skin and limb viability, ultimately with the potential of requiring amputation. In the worst case, infection from the skin (cellulitis) may unpredictably spread to the blood stream (sepsis) and potentially result in death.

(*Id.*).

---

[5] The Court can take judicial notice of the prior lawsuit. *Horne v. Potter*, 392 Fed.Appx. 800, 802 (11th Cir. 2010) (quoting Fed.R.Evid. 201(b))

9. There, Chief Judge Mark Walker entered a preliminary injunction requiring FDC to provide Plaintiff with the following hygiene supplies to control and abate his cellulitis symptoms: (a) five or more diapers a day (as needed); (b) barrier creams; (c) antiseptic soap; (d) medical wipes; (e) bathroom passes; and (f) shower passes. *See* Preliminary Injunction (Doc. 114-6).[6]

10. Plaintiff settled that lawsuit but did not intend through that settlement to resolve possible future claims against FDC for future conditions of his confinement. (Doc. 115 ¶¶ 8–10).

### *Upon Transfer, Plaintiff is Denied Services and Discriminated Against*

11. On October 15, 2020, FDC transferred Plaintiff to Suwannee C.I., which like NWFRC is a high-security camp. Plaintiff is in his 60s, was not incarcerated for violent offenses, and has no record of violence as a prisoner. Yet he continued to be kept in high-security prisons with violent offenders and substantial gang activity in retaliation for his grievances and litigation efforts. (Doc. 114-3 at Verified Answer No. 4(j) (PageID 2059)). In that setting, older, chronically ill and disabled prisoners who receive canteen money regularly are vulnerable to extortion and violence. (*See id.*). In addition, Plaintiff experienced times where he was forced to remain in foul-smelling diapers for sustained periods, which had made him a target of ostracism and sometimes violence. (*See id.*); *see also* Report of Dr. Venters

---

[6] The Court can take judicial notice of the preliminary injunction for the purpose of recognizing the "'judicial act' that the order represents or the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

(Doc. 114-8 at PageID 2167) (concluding that when facility cannot respond to the patient's health care needs, "friction quickly develops" involving retaliation by both health and security staffs which can endanger the prisoner's health further).

12. Upon arrival at Suwannee, Plaintiff's medications were confiscated and staff there stopped providing sufficient hygiene supplies. (*Id.* at Verified Answer No. 4(g) (PageID 2058)). He was also told that he was no longer an "ADA inmate." (Doc. 114-1 at 94:6-14). Plaintiff grieved these issues to Dixon. (Doc. 114-5).

13. In his interrogatory responses, his responses to FDC's requests for admissions, and during his deposition, Plaintiff has consistently detailed failures to provide adequate supplies, which have diminished over time in size and quantity, passes, and mobility devices. For example, Judge Walker had ordered FDC to provide Plaintiff with 5 diapers a day. (Doc. 114-6). Since his transfer to Suwannee C.I., Dr. Alexis Figueroa reduced his amount to 3 per day, then 20 per week, and then to 15-18 per week. (Doc. 114-3 at Verified Answer No. 4(g) (PageID 2058)).

14. At Suwannee C.I., Plaintiff's antiseptic wipes had been reduced from 80- to 50-count packs, (*see id.*). Plaintiff was also effectively denied medical passes to enable him to use the bathroom and shower as needed, keeping him in soiled diapers. (*See id.* at Verified Answer No. 4(b) (PageID 2056)). His mobility boots—which were prescribed to him to help with circulation—were stolen and FDC refused to replace them. (*See id.* at Verified Answers Nos. 1 & 2 (PageID 2051-52)). Despite Mr. Phillips's increasingly concerning and serious medical condition, FDC had reduced his medical and hygiene supplies, exacerbating Plaintiff's condition and

6

cellulitis. (*See id.* at Verified Answer No. 3 (PageID 2053)). Having enough of those supplies "gives [Plaintiff] a chance to have access to clean [him]self up properly instead of sitting in urine and feces for hours." (Doc. 114-1 at 30:1-7).

### *Opinion of Jason Chertoff, M.D., MPH*

15.     Dr. Chertoff, a board-certified diplomat of Internal Medicine, Pulmonary and Critical Care Medicine, and Neurocritical Care Medicine, who has authored several studies on sepsis and mortality in the U.S. prison system, rendered the opinion in this lawsuit that Plaintiff's condition has failed to improve since his earlier lawsuit. He opined to a reasonable degree of medical certainty that Plaintiff "has an exceptionally high risk of developing recurrences of his cellulitis or another soft tissue infection." (Doc. 114-7 at PageID 2143).

16.     Dr. Chertoff supports the earlier opinion of Dr. Kern that Plaintiff has most of the classic vulnerabilities for recurrences of cellulitis, along with the factor of being a prisoner. (*Id.*) He cites that 47% of patients treated for cellulitis experienced another episode of cellulitis within three years. (*Id.* at PageID 2144). He also concludes that "elevation of the affected limb, support stockings, and good skin hygiene can reduce the risk of recurrence." (*Id.*) An important consideration in reducing risk is also keeping the skin well hydrated with emollients. (*Id.*).[7]

17.     In his disclosed report, Dr. Chertoff also stresses that "consistent sustained care" was needed to prevent recurrences of cellulitis and ward off the

---

[7] Mr. Phillips's supplies of barrier creams were reduced from 8 oz. to 1 oz. since arriving at Suwannee C.I. (Doc. 114-3 at Verified Answer No. 4(h)).

potential for sepsis. (*Id.* at PageID 2145). As he concluded that "Since only a few interventions, such as attentive skin care and hygiene, leg elevation, weight loss, compression stockings, and prompt treatment of fungal infections, and regular wound care oftentimes by a dedicated wound care team have been shown to prevent recurrences, it is imperative that Mr. Phillips have these resources available. It is certainly reasonable to attribute Mr. Phillip's initial cellulitis to limited opportunities for personal hygiene and poor sanitary conditions, and I am confident that enhancements in these conditions will improve his condition. Undoubtedly, providing Mr. Phillips with necessary sanitation and personal hygiene resources, will provide him with the best chance for a complete cure and prevention of recurrence." (*Id.* at PageID 2145-46).

### *Opinion of Homer Venters, M.D., MPH*

18. Dr. Venters, whose report was also disclosed here, is a leading expert in medicine and epidemiology in a corrections setting, a Senior Health and Justice Fellow of the Community Oriented Correctional Health Services (COCHS), and a recognized national leader in health and human rights. *See* Report of Dr. Venters (Doc. 114-8). Dr. Venters served as the Director of Programs for Physicians for Human Rights and the Chief Medical Officer for the New York City jail system. (*Id.*). In addition to being the author of *Life and Death in Rikers Island*, Dr. Venters has had over 50 peer-reviewed scientific articles on the topics of health and justice involvement, work that has been cited by the U.S. Supreme Court and has led to testimony before Congress. (*Id.*).

8

19.     Dr. Venters agrees that Plaintiff had an extraordinary vulnerability to dangerous tissue infections, which began in July 2018 and did not cease at FDC. (*Id.*). He notes Plaintiff had continued to show the symptoms of cellulitis, and that at one point in 2020 Dr. Figueroa stated that "I don't recommend wipes or pull ups bc patient is continent and has no rash," (*id.* at PageID 2162), which is contrary to the photographic evidence. (Doc. 115 ¶¶ 5–7). Dr. Venters also comments on the manipulation of the Braden Scale Inventory, which FDC is required to undertake under its wound-care protocols (*id.* at PageID 2164), to make it appear that Plaintiff did not require attention of clinicians to monitor his skin condition. (*Id.*). He was also concerned that the ADA authorities at Suwannee C.I. denied Plaintiff's therapeutic "shoes and boots [because they] are not ADA." (*Id.* at PageID 2165).[8] Plaintiff was prescribed those boots by FDC to support his week ankles to help him walk holding on to his wheelchair. (Doc. 114-3 at Verified Answer No. 1).

## Memorandum of Law

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). An issue is "genuine" if a reasonable trier of fact,

---

[8] The question of whether an accommodation is necessary to enable performance of a major life activity is the test under the ADA, *see Davis v. SeaWorld Parks & Ent., Inc.*, 2023 WL 4763451, at *8 (M.D. Fla. July 25, 2023) (citing 42 U.S.C § 12102(1)(A)–(C)), not how a particular prison program classifies the accommodation.

viewing all the record evidence, could rationally find for the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx. 817, 820 (11th Cir. 2015). To prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). Accordingly, "the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party." *Shiver*, 549 F.3d at 1343.

I. **The Court should disregard Dixon's statement of facts and deny the motion because of his failure to comply with Rule 56.**

To begin with, the Court should disregard Dixon's statement of facts where he: (1) fails to specifically cite to record evidence to support his statements; (2) speculates or offers conclusory evidence; and (3) renders legal arguments.

Under Rule 56, a movant is required to provide a statement of material facts with citations to support each fact. *Deligdish v. Bio-Reference Lab'ys, Inc.*, 2018 WL 6261868, at *1 (M.D. Fla. Oct. 19, 2018) (citing Rule 56(c)(1)). "The Court 'need

consider only' the materials cited by the parties." *Id.* (citing Rule 56(c)(3)).

A statement of material facts should not contain legal conclusions or conclusory assertions. *See Farina v. Sushi Takara, Inc.*, 2008 WL 11405985, at *1 (S.D. Fla. Jan. 7, 2008) (citing *McKenzie v. Citation Corp., 2007* WL 1424555, at *6 (S.D. Ala. May 11, 2007)); *see also Barnext Offshore, Ltd. v. Ferretti Grp. U.S.A., Inc.*, No. 10-23869-CIV, 2012 WL 1570057, at *3 n.8 (S.D. Fla. May 2, 2012) ("inappropriate to raise legal argument in a statement of material fact"). Likewise, inadmissible evidence such as speculation and hearsay cannot be considered for summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Am. Key Corp. v. *Cole Nat'l Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

Dixon <u>argues</u> in his statement of facts that this lawsuit is a breach of a previous settlement agreement (Doc. 110 at 4), <u>explains</u> what his contentions are with respect to Plaintiff's allegations (*id.* at 5), <u>concludes</u> what the provisions in the settlement agreement mean (*id.*), <u>characterizes</u> that agreement and another agreement between Plaintiff and Centurion (*id.*), <u>speculates</u> about the reason for Plaintiff's dismissal of Centurion from this lawsuit (*id.* at 4–5), <u>opines</u> on the strengths of Plaintiff's claims (*id.* at 5) and continues to <u>characterize</u> Plaintiff's claims and deflect from them by providing Dixon's version of the facts, characterization of Plaintiff's claims and grievances, and what Dixon believes policies say, etc.—largely without record citations (*id.* at 5–11).

11

Dixon's statement of facts is wholly unsupported legal argument without any real fact citation. His failure to rely on any record evidence dooms his motion. On this basis alone, the Court should deny the motion. Even so, Plaintiff will address the rest of Dixon's motion as it relates to the pending ADA/RA claims.

## II. Plaintiff's claims are not barred by the doctrine of res judicata.

Dixon argues that Plaintiff's claims are barred by res judicata because he settled other claims in a prior lawsuit. His arguments fail because Plaintiff did not agree or intend to agree to resolve future claims against FDC for issues not directly related to his prior lawsuit. Dixon's position would effectively mean that Plaintiff had, through settlement, forfeited his right to ever challenge the conditions of his confinement again while still in the custody and control of FDC. Even if Dixon is right, public policy considerations should militate against his argument.

Looking at the subject settlement agreement, courts are constrained to determine the parties' intent in several ways. When the contract is clear, courts generally look to its terms. *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004) (citing Restatement (Second) of Contracts ch. 9, introductory note (1981) ("Where the parties have adopted a writing as the final expression of all or part of their agreement, interpretation focuses on the writing, and its terms may supersede other manifestations of intention."); *Monahan v. Comm'r*, 321 F.3d 1063, 1068 (11th Cir.2003) ("If the agreement is found to be free of ambiguity, its meaning can be declared by the court without the use of extrinsic evidence."). Otherwise, extrinsic evidence is necessary to determine intent.

12

To adduce the parties' intent, Dixon argues that the plain language of the contract should govern without extrinsic evidence. He argues that FDC's intent was "merely to avoid litigation and buy their peace" in exchange for payment. He also argues that the intent was to release all claims Plaintiff had at the time of signing—possibly precluding some claims that are at issue in this lawsuit but were never raised (nor could be raised after the pleadings closed in that action)—, not just those that were "growing out of the events and injuries that were at issue in [the earlier action]." But buying peace *in that lawsuit* did not mean that the parties were agreeing to release future claims. That is not the natural reading of that provision.

Dixon fails to include a competing and contradictory term in the agreement which states that the understanding by FDC was that the "Settlement, and the consideration for it extends to all claims asserted or which could have been asserted by [Phillips] against [FDC] in Case No. 4:18-cv-139-AW-MJF, United States District Court for the Northern District of Florida." That language would appear to conflict with Dixon's broad reading of the release to preclude claims that may have accrued at the time the parties' signed the settlement agreement but were not—and could not be brought—in the previous action. *Hegel v. First Liberty Ins.,* 778 F.3d 1214, 1221 (11th Cir. 2015) ("Terms and phrases cannot be viewed in isolation ...."); *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014) ("Traditional contract-interpretation principles make contract interpretation a question of law, decided by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent.").

13

When read together, the first and third paragraphs of the settlement preclude Dixon's theory that the settlement released every single claim that Plaintiff could have had against FDC or its staff even unrelated to the earlier action. The claims brought in that case or claims that could have been brought in that case—which centered on claims through December 2019 only, before Plaintiff was transferred to a facility in the Middle District—are the only claims that have been released. In allowing the plaintiff to proceed with suit in *Norfolk*—even without an express reservation of rights—the Eleventh Circuit determined that the release pertained to liability arising out of a narrow issue and the later suit "did not touch upon these subjects" identified in the release. 371 F.3d at 1290; *Arizona v. California*, 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) ("[S]ettlements ordinarily occasion no issue preclusion ... unless it is clear ... that the parties intend their agreement to have such an effect."). Nothing in the agreement evinces an intent to preclude future lawsuits about Plaintiff's conditions of confinement in different facilities. *See also Espinoza v. Target Corp.*, 2021 WL 3550780, at *3 (S.D. Fla. Aug. 11, 2021) ("It is similarly unclear in this case what limits the Release language 'which may hereafter accrue on account of or in any way growing out of' establishes."). And many claims alleged here center on denial of services and discrimination that occurred because Plaintiff had sued to get supplies earlier. His litigation made him a target. He did not release future conduct, the conduct at issue here, in his earlier lawsuit.

Even if the Court found that the third paragraph created ambiguity as to the meaning of the first, rather than clarifying the scope of the release, the Court should

14

resolve competing contentions in favor of Plaintiff. *Am. K-9 Detection Servs., Inc. v. Cicero*, 100 So. 3d 236, 239 (Fla. 5th DCA 2012) (to the extent any ambiguity does exist in a contract, the ambiguity will be strictly construed against the drafter), citing *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So.2d 1098, 1102 (Fla. 5th DCA 2006). Plaintiff did not intend to release future claims for future conditions of confinement, including retaliatory actions because of his prior litigation efforts. (Doc. 115 ¶¶ 8–10).

### III. Plaintiff's ADA/RA claims are not about "medical decisions" but denial of services and discrimination.

Dixon asserts that Plaintiff's claims are "a muddled attempt to conflate and commingle his medical and ADA issues," which he asserts Plaintiff has raised because he dismissed out Dixon's contracted-for health provider, Centurion of Florida. (Doc. 110 at 1 – 2, 22). Dixon's arguments fail for two reasons.

<u>First</u>, Dixon cannot evade liability simply because he has outsourced the provision of health services and ancillary services, such as ADA compliance. Dixon ignores that FDC owes a nondelegable duty to Plaintiff notwithstanding its contract with Centurion. *Cineus v. Fla. Dep't of Corr.*, 2022 WL 4448599, at *3 (M.D. Fla. Sept. 23, 2022) (denying a motion to dismiss FDC under the nondelegation doctrine). As explained in *Ancata v. Prison Health Servs., Inc.*, "federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals" and that "duty is not absolved by contracting with an entity" as the government "itself remains liable for any constitutional deprivations caused by the policies or customs" of that entity. 769 F.2d 700, 705 (11th Cir. 1985);

15

*see also Geftos v. Jones*, 2018 WL 1139055, at *3 (M.D. Fla. Mar. 2, 2018); *Hunt v. Gualtieri*, 2016 WL 1077361, at *3 (M.D. Fla. Mar. 18, 2016). Accordingly, Dixon's efforts to shield FDC from liability because of its contract with Centurion fails.

Second, Plaintiff's ADA/RA claims are not for "medical decisions," but for denial of services and discrimination, both of which are cognizable theories under ADA/RA.[9] Although the Supreme Court has held that the ADA does not govern medical decisions, it has, however, made clear that "medical services" fall under Title II. *See Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210, 118 S.Ct. 1952 (1998). A qualified inmate—and Dixon does not argue that Plaintiff was not covered by the ADA/RA or that the ADA/RA does not apply to FDC—who was denied the benefit of medical services because of his disability can state an ADA/RA claim. *See, e.g., Lonergan v. Fla. Dep't of Corrs.*, 623 F. App'x 990, 994 (11th Cir. 2015) (holding that prison's failure to give an inmate treatment prescribed by his dermatologist was "sufficient for the [inmate] to plead a prima facie ADA claim"); *Stafford v. Wexford of Ind.*, LLC, 2017 WL 4517506, at *3 (S.D. Ind. Oct. 10, 2017) ("Plaintiffs do not complain[ ] about the quality of care administered by Wexford; rather, they assert that Wexford has refused to treat Plaintiffs' disabilities, which is actionable under the ADA."); *Johnson v. Bryson*, 2017 WL 3951602, at *1 (M.D. Ga. Sep. 8, 2017) ("[T]he ADA is not wholly inapplicable to claims based on deliberate

---

[9] "Discrimination claims under the ADA and the [RA] are governed by the same standards, and the two claims are generally discussed together." *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017).

indifference to an inmate's medical condition."). Those are not claims of medical malpractice or medical treatment, but the quality of Plaintiff's "equal opportunity to *participate* in obtaining and utilizing services at [the jail]." *Silva v. Baptist S. Fla., Inc.*, 856 F.3d 824, 834 (11th Cir. 2017) (emphasis in original).

Contrary to Dixon's position in the motion, Plaintiff has adequately identified services from which he was excluded because of his disability. For instance, Plaintiff explained that FDC failed to accommodate his known disability, which impacted his access to safe housing and living conditions. Particularly, he was denied passes, sanitary supplies to keep from soiling himself, which created sanitary issues but also made him a target for violence. The failure to provide those supplies and passes, as well as mobility devices, impacted Plaintiff's ability to make it to the chow hall or otherwise participate in the services provided at FDC. (*See, e.g.*, Doc. 114-3 at Verified Answer No. 1). That all constitutes a denial of access to services. *See, e.g.*, *Arenas v. Ga. Dep't of Corr.*, 2018 WL 988099, at *8 (S.D. Ga. Feb. 20, 2018) (stating that access to safe housing may constitute a "service" or "benefit" under the ADA); *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (holding that an arrestee's transportation to the police station constitutes a "service" within the meaning of the ADA because the arrestee has a right to the benefit of transportation that meets his disability needs). Dixon comes forth with <u>no</u> record evidence to the contrary. His arguments that Plaintiff skipped ADA meetings, etc., is a red herring. It is first and foremost unsupported, but also that is not what a "service" is under the law.

Whether Plaintiff skipped an ADA meeting or refused to talk at one has no bearing on Dixon denying him the ability to live in safe housing or access meals.

Further, the ADA "does not mandate that a plaintiff be denied access to services as the sole means of establishing liability." *Walton for Est. of Smith v. Fla. Dep't of Corr.*, 2019 WL 2103024, at *12 (M.D. Fla. May 14, 2019). A plaintiff may, alternatively, establish liability "by demonstrating he was 'subjected to discrimination.'" *Id.* (citing 42 U.S.C. § 12132); *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1084–85 (11th Cir. 2007) (recognizing the Eleventh Circuit "has explained that the final clause of § 12132 protects qualified individuals...from being subjected to discrimination...and is not tied directly" to the provision of or access to services) (internal quotation marks omitted). Thus, under the discrimination theory, a "refusal to accommodate the needs of a disabled person amounts to discrimination against that person because of his disability." *Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 487, 492 (citing *Cmty. Coll. v. Davis*, 442 U.S. 397, 412–13 (1979)).

To recover damages, Plaintiff must show that FDC engaged in intentional discrimination, which requires a showing of 'deliberate indifference.'" *Ingram v. Kubik*, 30 F.4th 1241, 1257 (11th Cir. 2022). "To establish deliberate indifference, a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014).

The parties agree that Plaintiff was disabled. Plaintiff has shown he was punished because of his complaints related to his lack of access to supplies, devices,

18

and accommodations. That is discrimination because of his disability. Dixon has failed to show that there are no facts in dispute; he has not come up with any evidence.

### IV. Plaintiff's ADA/RA claims show actual knowledge of the discrimination and a failure to adequately respond.

Finally, Dixon argues that Plaintiff cannot recover under the ADA/RA because his claims are for vicarious liability, which the Eleventh Circuit has declared impermissible in the Title II context. But Plaintiff can show that Dixon had actual knowledge of the discrimination/lack of services but failed to adequately respond.

First, Dixon knew of the issues because Plaintiff previously litigated them and obtained an injunction to provide him with the necessary sanitary supplies to accommodate his disability. Second, Dixon was aware of the discrimination within FDC because of other litigation, including with Disability Rights Florida, which required court-monitoring for compliance with the ADA, particularly for inmates with mobility concerns. (Doc. 114-9). And third, Dixon knew of these issues because Plaintiff filed grievances with Dixon about them. (Doc. 114-5). Those grievances explained to Dixon that Plaintiff had his supplies taken from him and had lost his accommodations. (*See, e.g.*, *id.* at PageID 2091, 2102, 2106). Dixon knew about these failures, was in a position to do something, but failed to respond. All Dixon does is point to the operative complaint. He offers no facts to support the lack of knowledge.

At bottom, the fact that Dixon once provided Plaintiff with accommodations—though only under court order—but then receded from those accommodations, shows that Dixon knew Plaintiff had a disability, knew his

19

subordinates were not accommodating that disability, and had the ability to institute corrective measures, but decided not to. *See, e.g., Seymour v. Dixon*, 2021 WL 6197967, at *4 (N.D. Fla. Dec. 10, 2021) (finding that the plaintiff stated a plausible ADA claim against the Secretary by alleging that ill-fitting adult diapers caused leakage, which caused him to be excluded from meal time, and that FDC provided reasonable accommodation for the issue in the past but refused to continue access to accommodation), rep. & recommendation adopted by, 2021 WL 6197109, at *1 (N.D. Fla. Dec. 30, 2021). Dixon is not entitled to summary judgment.

## Conclusion

For these reasons, Plaintiff Donny Phillips requests that the Court deny Secretary Dixon's motion for summary judgment.

Dated: May 2, 2024

Respectfully submitted,

*/s/ James M. Slater*
James M. Slater (FBN 111779)
Slater Legal PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
Tel. (305) 523-9023
james@slater.legal

*/s/ James V. Cook*
James V. Cook (FBN 0966843)
Law Office of James Cook
314 W. Jefferson Street
Tallahassee, Florida 32301
Tel. (850) 222-8080
cookjv@gmail.com

*Attorneys for Plaintiff*